867 A.2d 259

ATTORNEY GRIEVANCE COMMISSION

v.

Jared K. ELLISON.

Misc. AG No. 46 Sept. Term, 2003.

Court of Appeals of Maryland.

Feb. 4, 2005.

690

Melvin Hirshman, Bar Counsel, Dolores O. Ridgell, Asst. Bar Counsel for Atty. Grievance Com'n, for petitioner.

Francis S. Brocato, Towson, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

This attorney conduct matter arises out of the on-again / off-again / on-again legal representation of John P. Moody in a personal injury claim and the assignment of recovery proceeds from that claim to one Avraham Strulson, a physical therapist who treated Moody for injuries suffered in the underlying motor vehicle accident. The Attorney Grievance Commission of Maryland (AGC), Petitioner, acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action against Jared K. Ellison, Esquire, Respondent, charging him with violations of Maryland Rules of Professional Conduct (MRPC) 1.5(c) (Fees),[1] 1.15(a), (b), and (c) (Safekeeping

---

1. MRPC 1.5(c) provides:

 A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is

Property),[2] 8.1(a), (b) (Bar Admission and Disciplinary Matters),[3] and 8.4(c), (d) (Misconduct).[4] Petitioner also charged

---

prohibited by paragraph (d) or other law. The terms of a contingent fee arrangement shall be communicated to the client in writing. The communication shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination.

2. MRPC 1.15 provides in pertinent part:
(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of representation.
(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

3. MRPC 8.1 provides:
An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or connection with a disciplinary matter, shall not:
(a) knowingly make a false statement of material fact; or
(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6.

4. The relevant portions of MRPC 8.4 state:
It is professional misconduct for a lawyer to:

Respondent with violations of Maryland Rules 16–606 [5] and 16–609. [6] Pursuant to Rule 16–752(a), we referred this matter to the Honorable Melanie Shaw Geter of the Circuit Court for Prince George's County to conduct a hearing and make findings of fact and proposed conclusions of law.

Judge Geter concluded, from the facts found credible by her and to a clear and convincing standard, that Respondent violated MRPC 1.5(c); 1.15(a),(b); 8.1(b); and 8.4(c). She further concluded that Respondent violated Md. Rules 16–606 and 16–609. Bar Counsel excepted to Judge Geter's refusal to find a violation of MRPC 8.4(d) and, regardless of its exception, recommended disbarment as the appropriate sanction. Ellison excepted to each of Judge Geter's conclusions of law and urged his version of the facts. In addition, Ellison excepted to a pre-hearing order rejecting his motion for an order compelling discovery regarding the Complainant, Strulson. Respondent recommended, in light of his exceptions, that we dismiss Bar Counsel's complaint, or, if we should find

---

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice.

5. Md. Rule 16–606 states:

An attorney or law firm shall maintain each attorney trust account with a title that includes the name of the attorney or law firm and that clearly designates the account as "Attorney Trust Account", "Attorney Escrow Account", or "Clients' Funds Account" on all checks and deposit slips. The title shall distinguish the account from any other fiduciary account that the attorney or law firm may maintain and from any personal or business account of the attorney or law firm.

6. Md. Rule 16–609 states:

An attorney or law firm may not borrow or pledge funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer.

grounds for any violations, they warranted no more than a reprimand.

## I.

We begin by considering Judge Geter's findings based on our independent review of the record. *Attorney Grievance Comm'n v. Stolarz*, 379 Md. 387, 397, 842 A.2d 42, 47 (2004) (citing *Attorney Grievance Comm'n v. Garfield*, 369 Md. 85, 97, 797 A.2d 757, 763 (2002); *Attorney Grievance Comm'n v. Wallace*, 368 Md. 277, 288, 793 A.2d 535, 542 (2002)). We have organized her findings in the following contexts for review: first, those relating to events occurring prior to Strulson's complaint to the AGC; second, as revealed during the AGC's investigation prior to the evidentiary hearing before her; and third, additional facts brought to light at the hearing.

## A.

Moody was injured in an automobile accident on 10 July 2002. He entered Strulson's care, upon referral by his primary physician, on 7 August for treatment of injuries inflicted during the accident. Strulson, a Maryland-certified physical therapist, treated Moody until 4 October 2002.

At the start of his treatment, Moody provided to Strulson only his automobile insurance provider, GEICO, as a source of payment for his care, although Moody had Medicare and Government Employees Hospital Association (GEHA) insurance coverage as well. When Moody completed the medical data form, he listed "uninsured" as the person responsible for payment of the treatment.[7] During and after his treatment of Moody, Strulson submitted Moody's medical bills initially only to GEICO, Moody's Personal Injury Protection (PIP) insurer. At the conclusion of Moody's treatment and after the exhaustion of Moody's PIP coverage (which occurred on 18 Novem-

---

[7]. Moody later would state, at the hearing before Judge Geter when he testified as a witness for Ellison, that he informed Strulson of his Medicare and GEHA coverage and that he provided Strulson's assistant with his insurance cards so that she could make copies of them.

ber 2002), Moody's account with Strulson had a balance due of $1,022.00.

On 11 October 2002 Moody signed a retainer agreement with the law firm of Donald M. Temple, P.C. (the Firm), to represent him in the personal injury matter. Ellison, a close friend of Moody's since at least 2000, was employed by the Firm[8] and signed the Firm's retainer agreement, on Firm letterhead stationary, as the "Responsible Attorney." The retainer agreement also provided for a contingency fee of thirty-three and one-third percent of any recovery to be paid to the Firm should the claim be settled prior to litigation.

On 14 October, Ellison, on Firm letterhead stationery, informed Strulson that "[t]his office has been retained" to represent Moody and requested a copy of Moody's medical bills and records. Strulson offered to send the bills and records after Moody and Ellison signed an Assignment and Authorization form (the Assignment) and paid a $50 administrative charge. The Assignment form authorized and directed Moody's attorney "to immediately pay all bills received from Avi Strulson, PT, from the proceeds of any recovery on [his] case" as soon as the funds were received. The Assignment also contained a clause purporting to require "any attorney to whom [Ellison] refer[red] this case, within or outside the firm, to honor this Assignment, as a condition of the referral." Ellison responded to the request by sending a personal check to Strulson for $50 and then signed and faxed to him a copy of the fully executed Assignment on 4 November. Moody then picked up the records from Strulson's office.

The Firm and Ellison's representation were terminated by a letter dated 6 November 2002 sent by Moody to Ellison.[9] The

---

8. Although Temple characterized Ellison as an "associate," Ellison more precisely was a contractual employee who received a percentage of the profits of the cases on which he worked.

9. A copy of this letter first appeared in this record as part of Ellison's 25 February 2003 response to Bar Counsel's initial investigatory inquiry. The copy of the letter sent to Bar Counsel stated, "[t]his letter is to inform you that I am terminating your firm's representation of my

letter stated that Moody was terminating the Firm's represen-
tation of his claim and implied that he would be handling his
own claim. In a letter dated 7 November 2002, also on Firm
stationery, Ellison informed Strulson that "our Firm no long-
er" represented Moody and the Assignment was "now null and
void."

Some time in mid-to-late November, Strulson returned a
phone call from Ellison regarding the account balance for
Moody. Strulson claimed that he merely told Ellison the
account balance and that there was no discussion about wheth-
er Moody's personal injury claim was settled (nor, according
to this record, was there any discussion about Ellison's letter
of 7 November).

Strulson treated Moody on 7 January 2003 for an injury
unrelated to the personal injury claim and learned during this
session that the personal injury claim had been settled. He
called Ellison the same day. Strulson stated that Ellison
claimed during this phone conversation that he no longer
represented Moody, there had been no settlement of Moody's
claim, Ellison did not owe Strulson any money, and Strulson
should bill Medicare for the balance due on Moody's account.

On or about 11 January 2003, Strulson received a letter,
dated 9 January 2003, from Ellison stating that the Firm no
longer represented Moody and that "it [had] been brought to
my attention, [sic] that my first letter [the letter dated 7
November 2002] informing your office that we longer repre-
sent Mr. Moody was not received." Strulson filed a complaint
with the AGC on 10 February 2003, against Ellison as a
member of the Firm.[10] Strulson claimed that Ellison, while

---

personal injury claim. Please forward any and all correspondence
regarding my case to me." A copy of a similar letter from Moody to the
Firm, also dated 6 November 2002, was sent by Ellison to the Office of
Bar Counsel for the District of Columbia with a letter dated 14 Febru-
ary 2003. This copy of the letter stated, "[t]his is to inform you that I
will be handling my own claim. I am terminating the services of the
Temple Law Offices, effective immediately. If you have any questions,
please feel free to contact me."

**10.** Strulson also filed concurrently a complaint against Donald Temple
with the Office of Bar Counsel for the District of Columbia. The Firm

acting on behalf of Moody as his attorney, violated the terms of the Assignment by not paying the balance due on Moody's account from the proceeds of the settlement.

### B.

Bar Counsel sent a letter to Ellison at his home address on 21 February 2003 requesting a response to Strulson's complaint. In a letter on Firm stationery dated 25 February 2003, Ellison responded that Moody "terminated the representation of our law office" and that Strulson's Assignment and his subsequent complaint concerning unpaid medical bills were invalid and unmerited, respectively. Attached to his letter were copies of the retainer agreement between the Firm and Moody; Moody's termination letter as to the representation; two letters allegedly sent from the Firm in November 2002 and January 2003 to Strulson informing him that the Firm no longer represented Moody; a copy of the Assignment between Strulson, Ellison, and Moody; and an affidavit by Moody. Ellison also attached a letter, dated 24 February 2003, from Donald Temple which stated that "all documents that [the Firm] has relating to Mr. John P. Moody" were enclosed. Temple's letter confirmed that he believed the Firm's representation of Moody was terminated by the 6 November 2002 letter from Moody and that Strulson's claim was "specifically designed to harass this law firm and Mr. Ellison. He is duly aware that we have no responsibility for Mr. Moody's medical bills."

John W. Reburn, Bar Counsel's investigator assigned to the complaint, conducted an investigation of Ellison. Bar Counsel received a letter dated 2 April 2003 from Ellison, on Firm stationery, stating that Moody had informed Ellison that Strulson was paid in full. On 8 April 2003, Reburn contacted GEICO by telephone and learned that a $5,000.00 settlement

---

responded to this investigation with a letter dated, 25 February 2003, that Moody had terminated the Firm's representation in order to represent himself and that Strulson had no claim against Temple or the Firm under the Assignment.

check had been issued on 15 November 2002 in settlement of Moody's personal injury claim.[11] Reburn learned that Ellison continued to represent Moody in his personal claim and that the settlement check was drafted in both of their names and had been mailed to Ellison's home address. The PIP coverage, which Strulson had been billing for Moody's care, became exhausted at or about the same time the settlement check was issued.

On 15 April 2003, Reburn met with Ellison to review Ellison's documents regarding Moody's representation and discuss further the investigation. Ellison claimed initially that his "file" was unavailable because the Office of Bar Counsel for the District of Columbia had it. Over the course of the interview, Ellison admitted that he had represented Moody throughout the pendency of his claim and had negotiated the settlement with GEICO. Reburn also asked Ellison about the settlement check. Ellison stated that he paid the funds he received from GEICO to Moody. When Reburn asked if he had received a fee for his services, Ellison replied, "I paid it to Mr. Moody." Ellison also stated that he either had not prepared or retained a copy of the settlement sheet for Moody's settlement funds. Reburn concluded the interview by requesting information regarding the settlement funds received and disbursed, the demand letter sent to GEICO, and the medical records and source of the $50 fee sent to Strulson at the time the Assignment was executed.

Ellison responded to Reburn on his personal stationery by letter of 16 April 2003. He stated that he was not able to locate a copy of the actual demand letter sent to GEICO, but enclosed an unexecuted copy while he continued to search for a copy of the original. Ellison also explained that the $50 fee

---

11. GEICO would later confirm this information in a letter dated 15 March 2004 to Bar Counsel. The attached copies of its ordinary business records dealing with Mr. Moody's claim included a copy of Mr. Ellison's demand letter faxed on 5 November 2002, a letter from GEICO dated 18 November 2002 sent to Mr. Ellison as Mr. Moody's attorney, and a release signed by Mr. Moody and faxed from Mr. Ellison's home fax under his cover sheet on 2 December 2002.

paid to Strulson "came from Mr. Moody" and was not from his escrow account. He concluded by stating that "the settlement check of five thousand dollars ($5,000.00) from GEICO was endorsed by myself and Mr. Moody and was deposited into my IOLTA account and I then paid Mr. Moody."

Reburn followed with a letter dated 1 May 2003. He requested a full accounting of the funds received and disbursed on behalf of Moody, copies of all bank statements and cancelled checks regarding Moody's funds, and an accounting of how Ellison paid the $50.00 fee to Strulson for the medical records. He further requested an explanation as to why Ellison did not disclose his continued representation of Moody in his initial response to Bar Counsel's initial inquiry in February 2003 and whether the Firm knew that Ellison continued to represent Moody after 6 November 2002.

Ellison "finally explained" in a letter dated 13 May 2004 that he had represented Moody in his settlement and received a fee for his services. His enclosed bank statements and checks revealed that he deposited the $5,000.00 check on 2 December 2004 in an account labeled "Jared K. Ellison, Esq. IOLTA"[12] and that he had disbursed $1,715.00 to himself on 3 December for "legal services rendered." He then distributed $3,285.00 to Moody from the account, by check, on 4 December 2002. He also stated that the $50.00 "received from Mr. Moody to pay Avi Strulson went directly to Avi Strulson."

The letter continued that the Firm did not know that Ellison continued to represent Moody after 6 November 2002. He did not disclose his continuing representation of Moody in response to Bar Counsel's initial inquiry because he "honestly believed that all agreements with Avi Strulson terminated because [he] signed the authorization and assignment while handling Mr. Moody's case on behalf of the firm." Ellison further asserted that he believed that Bar Counsel merely

---

**12.** Ellison later would claim that his client trust fund account at Bank of America was named in that fashion because the bank "said this is how that could be set up, and this is how the name and all go on your account."

wanted to know when the Assignment "was terminated which I believed ended any obligation that I had to Avi Strulson."

Reburn continued his correspondence with Ellison with a letter dated 20 May 2003. He requested the Firm's and Ellison's personal injury case file for Moody, a copy of Ellison's written contingent fee agreement with Moody, and an explanation as to why Ellison did not inform Temple that he continued to represent Moody after 6 November 2002. Ellison responded via letter dated 28 May 2003. He stated that he "submitted to [Reburn] all the documents that I have relating to Mr. John Moody." Contrary to his previous assertion at the 15 April 2003 interview when he stated the Moody file was still in the possession of the Office of Bar Counsel for the District of Columbia Bar, he also stated that his personal Moody file was the same file the Firm had. Ellison could not locate a written contingency fee agreement, but forwarded an "exact duplicate of the retainer agreement that Mr. Moody would have signed." He did not inform the Firm that he was continuing to represent Moody after 6 November because he "was doing a favor for Mr. Moody ..." because "Mr. Moody was a neighbor of mine."

Temple stated at his pre-hearing deposition that Ellison was free to represent other clients outside of the Firm, although he did not know of any that Ellison had so represented in 2002.[13] Temple acknowledged his understanding that the Firm had been retained by Moody, but that Moody later terminated the representation.

With regards to Ellison's representation of Moody, Temple averred that he did not know that Ellison continued to represent him until Bar Counsel commenced its investigation. Temple also stated that he did not know Ellison received a fee from Moody, but that fact did not bother him "in the slightest." He did not believe the Firm was owed any portion of

---

**13.** Temple was unavailable to testify at the hearing. His deposition was submitted into evidence at the hearing in lieu of his testimony.

the fee from the settlement. Finally, in Temple's opinion, Ellison did nothing wrong in this matter.

## C.

At the two-day hearing on 8 and 9 July 2004 before Judge Geter, Ellison testified. Judge Geter weighed his testimony in the following manner:

> At the hearing, Respondent acknowledged that the retainer agreement he had Moody sign was on "Temple Law letter-head," and although it listed him (Respondent) as the responsible attorney, the agreement was "between Moody and Donald M. Temple, P.C." Respondent also testified, however, that Moody was never a client of the Temple Law Office, and that it was a "mistake" for him to use the firm's letterhead because "it made it seem as [though] Temple Law Offices was representing Moody, when Temple Offices did not represent Moody." Respondent further testified that Moody understood that he was not retaining the firm because "Moody was [Respondent's] client prior to [Respondent] going to [work at] Temple Law Offices."
>
> Respondent also testified that he "did not recall Moody signing another agreement" once Respondent began representing Moody after the termination. Respondent further testified that he did not "ever recall giving Moody [a written statement] and he signing it" once Respondent received the settlement from GEICO in Moody's case. Respondent explained that assuming *arguendo* he never executed a second retainer agreement between himself and Moody, it was because he and Moody verbally agreed to the same terms as those contained in the previous agreement, including the same percentage for the contingency fee.
>
> After Respondent received the settlement check in Moody's case, he admittedly did not call Strulson to notify him that a settlement had been received. Respondent testified that during a telephone conversation initiated by Strulson in late November of 2002, Strulson informed Respondent that he was already aware that Moody's case had been settled.

Strulson did not tell Respondent how he had obtained the information. Although Strulson likewise testified that he returned a call from Respondent in mid to late November of 2002, he also testified that the conversation was only regarding Moody's account balance for treatment rendered and Respondent made no mention of a settlement having been received. In fact, Strulson testified that he did not find out that the case had been settled until January 7, 2003, when Moody was referred back to him for treatment of an old military injury. Respondent acknowledged that at the time he disbursed the settlement funds to himself and Moody in early December of 2002, he had not received information, and had not taken any steps to find out, whether Medicare had paid Strulson.

Strulson said that he asked Moody about his personal injury case, at which point Moody informed him that the case had been settled. Strulson further testified that he immediately called Respondent to inquire about the settlement and to inform him that there was a balance on Moody's account that Respondent was obligated to pay in accordance with the [Assignment]. According to Strulson, Respondent told him that he was no longer representing Moody, there had been no settlement in the case, that he (Respondent) did not owe Strulson any money, and to bill Medicare for the balance owed.

## II.

### A.

■ Before proceeding to the exceptions to Judge Geter's written findings and conclusions, we address Ellison's contention regarding the denial of his pre-hearing motion to compel discovery from Strulson.[14] Ellison believes that Strulson used

---

**14.** Maryland Rule 16-710(a) directs that post-charging discovery in an attorney grievance case proceed in accordance with Chapter 400 of Title 2 of the Rules, the rules for discovery in civil cases in the circuit courts. The hearings are governed "by the same rules of law, evidence

the attorney grievance process as an unlawful means to leverage Ellison and Moody into overpaying for Moody's medical treatment. Therefore, his request to inquire further into that suspicion was denied improperly.

Strulson received a subpoena duces tecum to appear for deposition with all documentation concerning: complaints against Strulson before any licensing body; any contact Strulson had with the AGC regarding Ellison or any other lawyer; and any civil suit or AGC grievance complaint for any violations of assignment payment terms between Strulson and any other lawyers. Strulson attended the deposition, but without these documents, if any existed. Strulson also did not file an objection to the subpoena or a motion for a protective order as generally prescribed by Md. Rules 2–510(f) and 2–403.[15]

On 24 May 2004, Ellison filed his motion pursuant to Rule 2–432(b)(G).[16] In his memorandum in support of the motion, Ellison argued that Strulson's complaint to the AGC was nothing more than a bill-collecting strategy using the AGC and Bar Counsel as a means to compel payment for his services. It was hypothecated that discovery likely would show Strulson's technique of bringing complaints against lawyers through Bar Counsel as a means to obtain payment of his billings. If so demonstrated, it was posited that this would reflect negatively upon Strulson's character and credibility in the present case.

---

and procedure as are applicable to the trial of civil proceedings in equity." Md. Rule 16–710(d).

15. The applicable portion of Md. Rule 2–510(f) states:
A person served with a subpoena to attend a deposition may seek a protective order pursuant to Rule 2–403. If the subpoena also commands production of documents or other tangible things at the deposition, the person served may seek a protective order pursuant to Rule 2–403 or may file, within ten days after service of the subpoena, an objection to production of any or all of the designated materials.

16. Section (b) allows a party to "move for an order compelling discovery if: ... (G) a nonparty deponent fails to produce tangible evidence without having filed written objection under Rule 2–510(f)."

Bar Counsel responded to Ellison's motion with its own motion in limine and request to limit the scope of discovery. In its motion, Bar Counsel noted that discovery of Strulson's extrinsic conduct was unrelated and irrelevant to Ellison's conduct regarding the Assignment and Moody's representation. Strulson's conduct, which was not subject to an investigation by Bar Counsel, was also not the subject of the petition in the present case. Furthermore, information relating to other Bar Counsel investigations initiated by Strulson's complaints, if any, would be confidential and generally protected from discovery by Rule 16–723(b). The hearing judge refused to accord relief to Ellison.

Ellison relies on *Attorney Grievance Comm'n v. Stolarz,* 379 Md. 387, 842 A.2d 42 (2004) on this issue. We, however, did not part so broad a swath in the ocean of prohibited attorney conduct in *Stolarz* as Ellison conceives. First, Ellison points out that we stated in *Stolarz* that use of a grievance against an attorney as a means to collect a debt "is certainly not a legitimate or appropriate use of the grievance procedures of this state." *Id.* at 396, 842 A.2d at 46. Although we undeniably included those words in *Stolarz,* a review of that sentence fragment in context with the rest of the paragraph of which it was a part in that opinion reveals that we merely were restating the hearing judge's conclusions of law as he discussed Stolarz's argument as to why he threatened the complainant in that case with a defamation lawsuit:

Stolarz maintains that he believes the Complainant threatened to bring this action in an effort to collect his client's debt, which is certainly not a legitimate or appropriate use of the grievance procedures of this state.... Based upon the aforementioned reasons this Court [referring to the hearing judge] finds by clear and convincing evidence that Respondent did not act unreasonably in warning Complainant that a defamation claim would be asserted when he rationally believed that Complainant would defame him.

*Id.* at 396, 842 A.2d at 46–47. The hearing judge in that case ultimately concluded that Stolarz's warning of a defamation claim against the complainant did not rise to a violation of

MRPC 8.4(d). Our actual holding was quite succinct and limited solely to Bar Counsel's exception to the hearing judge's conclusion regarding Bar Counsel's inability to prove by clear and convincing evidence a violation of MRPC 8.4(d); "[t]his finding is not clearly erroneous based on the limited record in this case and we therefore decline to overrule it." *Id.* at 401, 842 A.2d at 50 (footnote omitted).

Ellison also claimed in his motion that he did not believe Strulson had a valid interest in the settlement proceeds and that, even if he did, the amount due was clearly in dispute. Under this theory, discovery might reveal that Strulson had used the AGC or other civil remedies to obtain payments for other "invalid" interests or "disputed" balances under assignments from other attorneys and their clients. Once again, Ellison relies incorrectly on *Stolarz*, this time employing it in an exercise in inverse logic. In *Stolarz*, we stated, evaluating a claimed violation of MRPC 1.15(b), that "[i]f the creditor's claim is a valid interest and the amount of that interest is undisputed, then the lawyer should disperse directly to the creditor from the settlement proceeds." *Id.* at 400, 842 A.2d at 49. Stolarz had signed an assignment to a client's lender in the amount of $300.00 and then, by innocent oversight, failed to pay the assignment when he received and disbursed the settlement proceeds. What we did not state in *Stolarz*, and what we can only conclude that Ellison appears to rely on, is the inverse—when there is a dispute as to the amount of the claim, the lawyer has no obligation either to pay the assignment or ascertain the correct amount due under the assignment. Such a reading of *Stolarz* as Ellison urges is irreconcilable with the directions of MRPC 1.15(b) that place an affirmative burden on the attorney both to notify the third party assignee upon receipt of burdened funds and deliver the proper amount due to the third party.

Lastly, as Bar Counsel correctly stated in its motion, records of an investigation by Bar Counsel are confidential generally. None of the recognized exceptions to this confidentiality are argued to be applicable here. Thus, any Bar Counsel investigation of attorneys initiated by complaints by

Strulson ordinarily would not be discoverable under Rule 16–723(b). Ellison's exception in this regard is overruled.

## B.

■■■■ We turn to review of the exceptions of Ellison and Bar Counsel, in turn, to Judge Geter's written findings and conclusions. " '[W]e review the findings of the hearing judge to determine whether they are based on clear and convincing evidence, that the hearing court's findings of fact are *prima facie* correct and will not be disturbed unless they are shown to be clearly erroneous.' " *Attorney Grievance Comm'n v. Culver,* 371 Md. 265, 274, 808 A.2d 1251, 1256 (2002) (quoting *Attorney Grievance Comm'n v. Barneys,* 370 Md. 566, 577, 805 A.2d 1040, 1046 (2002) (citations omitted in original)). When the findings are not clearly erroneous, exceptions will be overruled. *Attorney Grievance Comm'n v. Brown,* 380 Md. 661, 669, 846 A.2d 428, 432–33 (2004) (citing *Attorney Grievance Comm'n v. McCoy,* 369 Md. 226, 234–35, 798 A.2d 1132, 1137 (2002)). "Our review of the hearing judge's conclusions of law is *de novo.*" *Stolarz,* 379 Md. at 397, 842 A.2d at 47 (citing *Attorney Grievance Comm'n v. McLaughlin,* 372 Md. 467, 493, 813 A.2d 1145, 1160 (2002); *Attorney Grievance Comm'n v. Dunietz,* 368 Md. 419, 428, 795 A.2d 706, 711 (2002)).

■■ Ellison excepts to the supporting findings and conclusion that a violation of MRPC 1.5(c) occurred. He maintains that the written contingency fee retainer agreement signed by Moody with the Firm satisfied his obligation under MRPC 1.5(c). Furthermore, he asserts that an itemized settlement statement was unnecessary when he disbursed the settlement proceeds because Ellison believed there was no third party assignee to pay, notwithstanding the Assignment to Strulson.

Judge Geter found, contrary to Ellison's contentions, that Moody retained the Firm with regard to his personal injury claim and then terminated that representation with his ·6 November 2002 letter. The now-invalid contingency fee arrangement with the Firm did not meet the requirement for a

written fee arrangement between Ellison, acting outside the Firm, and Moody. Although Judge Geter credited Ellison with having an oral arrangement with Moody for a contingency fee, her findings that there was neither a written contingency fee agreement nor a written settlement statement are not clearly erroneous. This exception is overruled.

Ellison excepts to the findings and conclusions as to the violation of Rule 16–606, for not properly designating his attorney trust account; Rule 16–609, for disbursing unauthorized funds to himself and Moody before satisfying the Assignment; and MRPC 1.15(a), for not complying with Title 16, Chapter 600 of the Maryland Rules. The hearing judge observed that Ellison's incorrectly designated account checks were sufficient to violate both Rule 16–606 and MRPC 1.15(a). We overrule these exceptions.

■ Rule 16–606 is quite clear; it requires that all attorney trust accounts be designated in one of three manners. Ellison did not comply with this Rule, whether by ignorance or willful intent. *Attorney Grievance Comm'n v. Blum*, 373 Md. 275, 300, 818 A.2d 219, 234 (2003) ("the hearing judge was correct when he concluded[ that Blum violated Maryland Rule[ ] 16–606 ... when he named his attorney trust account 'Bruce David Blum Law Firm "IOLTA" ' "); *see Attorney Grievance Comm'n v. Bernstein*, 363 Md. 208, 228, 768 A.2d 607, 618 (2001) ("every attorney is deemed to know the Rules of Professional Conduct and is charged with the knowledge of how to operate and maintain a trust account").

■ The hearing judge correctly concluded that Rule 16–609 was violated. The Assignment between the Firm (by Ellison) and Moody on one hand and Strulson on the other was valid even after the Firm no longer represented Moody. The Assignment, by its terms, applied to any referral of Moody's claim to a lawyer inside or outside the Firm—and certainly purports to apply to Ellison's continued representation of Moody. The validity of this specific clause was not contested before Judge Geter. Although Ellison contested the validity of the Assignment before the AGC, he conceded

before us that he no longer maintained any contention regarding the validity of the Assignment. Thus, Judge Geter's factual findings were not clearly erroneous; nor was her finding incorrect that the distributions to Moody and Ellison were unauthorized while the Assignment remained in force.

Ellison further argues that the violation of MRPC 1.15(a) is duplicative of the charge of violating Rule 16–606, but offers no other explanation for why this result is incorrect. The gravamen of his exception is misplaced; it is not outside the purview of this Court to draft overlapping rules, a narrow one for managing attorney client trust fund accounts and a broader one to set a minimum standard of professional conduct in dealing with attorney/client trust funds. As such, a set of facts that constitutes a violation of one may violate also the other without there necessarily arising an unfairly duplicative set of sanctions. His exception to supposedly duplicative violations is overruled. We shall consider later this exception, however, with regard to the proper sanction that may be imposed here.

Ellison's exception to the recommendation of a violation of MRPC 1.15(b) also is misfounded and consequently overruled. Although he claims that Strulson had knowledge from GEICO of the personal injury claim settlement as early as November and thus Ellison had no need to inform Strulson, his assertion of when Strulson gained that knowledge is irrelevant. MRPC 1.15(b) places an affirmative burden on the attorney to contact the third party assignee and deliver the appropriate funds to that third party. *See Attorney Grievance Comm'n v. Sheridan*, 357 Md. 1, 21–22, 741 A.2d 1143, 1154 (1999) (quoting *Roberts v. Total Health Care, Inc.*, 349 Md. 499, 519, 709 A.2d 142, 151–52 (1998)). It was not clearly erroneous for Judge Geter to conclude that Ellison made no effort to contact Strulson after he received the settlement funds (in fact, Ellison made substantial efforts to avoid such contact).

Ellison further asserts, as he did in his pre-hearing motion for discovery, that he was required to deliver funds under MRPC 1.15(b) only to parties he believed had a valid interest

in the settlement proceeds and then only when the amount of the funds due was undisputed. In Ellison's opinion, Strulson did not have a valid interest because the Assignment was "null and void." Furthermore, he claims that he did not receive any billing statements from Strulson and therefore it was impossible for him to conform with MRPC 1.15(b). Finally, he defends his inability to comply because the amount due to Strulson was disputed. We already have addressed Ellison's failed extension of *Stolarz* in addressing his pre-trial discovery motion. Ellison was subject to a valid Assignment and Judge Geter had ample evidence before her supporting the conclusion she reached that Respondent did not fulfill his obligation to notify or pay Strulson.

▪▪▪ Ellison next excepts to Judge Geter's conclusion that he violated MRPC 8.1(b) because he failed to disclose that he received a fee for representing Moody. Ellison highlights the following exchange during cross-examination of Reburn at the hearing that he claims makes Judge Geter's associated fact-finding clearly erroneous:

[RESPONDENT'S COUNSEL]: He never actually said to you, in these words, I never received it, a fee, did he?

[MR. REBURN]: Those words, I never received a fee?

[RESPONDENT'S COUNSEL]: Yeah?

[MR. REBURN]: No.

In reaching her conclusion, Judge Geter instead credited Reburn's testimony on direct examination. Reburn there stated that he asked Ellison during the 15 April 2003 interview if he received a fee and that Ellison replied "I paid it to Mr. Moody."

Ellison maintains that he never knew there was a misunderstanding about the fee he received from Moody and, in accordance with the Comment to MRPC 8.1, he cannot be in violation of that rule.[17] In his opinion, there was never a

---

17. The relevant portion of the Comment states, "[t]his Rule also requires affirmative clarification of any misunderstanding on the part of

question throughout his correspondence with Bar Counsel and Reburn that he represented Moody at all times and the Firm never represented Moody. Contrary to this contention, Judge Geter correctly found a violation based on the executed retainer agreement and fee arrangement with the Firm, the termination letters from Moody to the Firm, and the letters and conversations between Strulson and Ellison regarding representation of Moody. In addition, during Reburn's interview on 15 April 2003, he asked Ellison if he had received a fee. At that point, Ellison knew that there was a question regarding the representation, fee arrangement, and disbursement of settlement proceeds to Moody; he was on notice of the misrepresentations and did not make the appropriate disclosures to correct the "misapprehension" of Bar Counsel and Reburn throughout the investigation.

 Ellison lastly excepts to Judge Geter's finding of a violation of MRPC 8.4(c). Judge Geter explained that Ellison's 7 November 2002 letter, in which he informed Strulson that the Firm no longer represented Moody and to direct all future inquiries to Moody, misrepresented his ongoing representation of Moody. Judge Geter found that this letter's main purpose was to declare erroneously the Assignment "null and void" and allow Ellison to avoid paying Strulson under the Assignment. Furthermore, the hearing judge found that Ellison's dishonesty in misrepresenting the facts to Reburn supported finding a violation of MRPC 8.4(c). Once again, there is ample evidence in this record to support Judge Geter's findings and conclusions.

### III.

 Bar Counsel excepts to Judge Geter's refusal to find that Ellison's conduct violated MRPC 8.4(d). The same evidentiary findings supporting the violations of MRPC 8.4(c) and 8.1(b) provide clear and convincing evidence that Ellison en-

the admissions or disciplinary authority of which the person involved becomes aware."

gaged in conduct that is prejudicial to the administration of justice. Bar Counsel is correct.

We previously have found violations of MRPC 8.4(d) when a lawyer's specific act of dishonesty might cause the public to lose confidence in lawyers generally and respect for "the judicial system as a whole." *Attorney Grievance Comm'n v. White*, 354 Md. 346, 364, 731 A.2d 447, 457 (1999) (citing *Attorney Grievance Comm'n v. Richardson*, 350 Md. 354, 368, 712 A.2d 525, 532 (1998) (citing *Maryland State Bar Ass'n v. Agnew*, 271 Md. 543, 549, 318 A.2d 811, 814 (1974))). It is almost axiomatic that at "the foundation of the rule of law is respect for the law, courts and judges who administer it." *Attorney Grievance Comm'n v. Link*, 380 Md. 405, 425, 844 A.2d 1197, 1209 (2004). In *White*, we overruled the respondent's exception to violations of MRPC 8.4(c) and (d) where her testimony under oath was "at the very least, dishonest, deceitful, and misrepresented the truth about her involvement in the case." 354 Md. at 363, 731 A.2d at 457. This same dishonesty, which was clearly a violation of MRPC 8.4(c), also violated 8.4(d) because it engendered public disrespect of the courts that was prejudicial to the administration of justice.

In *Attorney Grievance Comm'n v. Link*, we fashioned a test to determine when an attorney's non-criminal conduct might rise to a violation of MRPC 8.4(d). We stated that conduct violated MRPC 8.4(d) when it was "so egregious as to make the harm or potential harm, flowing from it patent will that conduct be considered as prejudicing, or being prejudicial to, the administration of justice." *Link*, 380 Md. at 429, 844 A.2d at 1211–12. We did not conclude that Link's conduct violated MRPC 8.4(d) because his inappropriate verbal conduct towards Maryland Vehicle Administration employees did not rise to a level where the harm or potential harm flowing from his comments was patent. *Id.* at 429, 844 A.2d at 1212.

The analytical test employed in *Link* was rejected by some members of this Court as lacking sufficiently fair notice to lawyers of potential future conduct that would violate the standard, and consequently, MRPC 8.4(d). *Id.* at 432, 844

A.2d at 1213 (Raker, J., dissenting). The dissent fashioned an alternative test to determine when an attorney's non-criminal conduct was prejudicial to the administration of justice that, in the dissent's view, more properly aligned our interpretation of MRPC 8.4(d) with our prior holdings. Judge Raker stated that an attorney's non-criminal conduct must have "some connection, directly or indirectly, to the practice of law," before it violates 8.4(d). *Id.*

In her dissent in *Link,* Judge Raker cited approvingly to Judge Eldridge's exacting research of our cases considering alleged violations of MRPC 8.4(d) in his dissent in *Attorney Grievance Comm'n v. Sheinbein,* 372 Md. 224, 277–78, n. 12, 812 A.2d 981, 1012–13, n. 12 (2002) (Eldridge, J., dissenting). Judge Eldridge noted there that we had found violations previously of MRPC 8.4(d) for non-criminal conduct where an attorney's personal conduct concerned his or her own legal practice or relationship with his or her clients. *Id.* For example, in *Attorney Grievance Comm'n v. Bridges,* 360 Md. 489, 514, 759 A.2d 233, 246 (2000), we held that Bridges "direct attempt to conceal inappropriate behavior" was sufficient to find a violation of MRPC 8.1(b). That same conduct (refusing to respond to Bar Counsel's requests for information and refusing to attend a hearing before an Inquiry Panel) and concealing his whereabouts from Bar Counsel before a hearing of the Inquiry Panel was sufficient to support a violation of MRPC 8.4(d).

Regardless of this diaspora within the Court, both camps agree that Ellison's conduct satisfies either test. We sustain Bar Counsel's exception and conclude that Ellison's conduct violated MRPC 8.4(d). His failure to disclose to Bar Counsel (and Reburn) his continued representation of Moody (and his $1,750.00 fee), until faced with producing the ultimate documentation of his violation, was misleading and an attempt to avoid disclosure. His dishonest and deceitful conduct regarding Strulson and the Assignment not only violates his obligations under the Maryland Rules of Professional Conduct, but also engenders a public disrespect for attorneys and the courts. This conduct is connected inherently with the Elli-

son's practice of law on behalf of a client and with his cavalier manner of addressing valid assignments with third-party assignees.

Furthermore, his continued dishonest and deceitful conduct with Reburn and Bar Counsel regarding his allegedly-severed ties with Moody also engenders disrespect for the attorney grievance procedure and the judicial system as a whole. This conduct is both directly and indirectly connected with the practice of law—implicating the appropriate ethical obligation of an honest response to Bar Counsel's investigation and revealing Ellison's disrespect as a whole for his obligations under the Maryland Rules of Professional Conduct.

## IV.

We now address the appropriate sanction. We reiterate that "[t]he purpose of these proceedings is not to punish the lawyer, but any sanction imposed should deter other lawyers from engaging in similar misconduct." *Stolarz,* 379 Md. at 402, 842 A.2d at 50 (citing *Attorney Grievance Comm'n v. Mooney,* 359 Md. 56, 96, 753 A.2d 17, 38 (2000)). We protect the public by preventing future attorney misconduct only when the sanctions imposed "are commensurate with the nature and gravity of the violations and the intent with which they were committed." *Id.* (citing *Attorney Grievance Comm'n v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997)).

It is once again useful to remind ourselves of the American Bar Association's suggested inquisitory framework for fashioning an appropriate sanction.

(1) whether the lawyer has violated a duty owed to a client, to the legal system, or to the profession;

(2) whether the lawyer acted intentionally, knowingly, or negligently;

(3) the amount of the actual or potential injury caused by the misconduct; and

(4) the existence of any aggravating or mitigating factors.

Model Rules for Lawyer Disciplinary Enforcement R. 10(c) (1999).

We have discussed already Ellison's numerous ethical lapses in this case. His transgressions include dishonesty with and misrepresentations to Bar Counsel in connection with this disciplinary matter, improper contingency fee arrangements, improper handling of property belonging to a third party assignee, various Maryland Rules violations regarding the handling of funds in attorney trust accounts, and attorney misconduct involving dishonesty and the administration of justice.

In reviewing Judge Geter's findings, we find that Ellison acted intentionally, the "most culpable mental state," because he acted with a "conscious objective or purpose to accomplish a particular result." *Attorney Grievance Comm'n v. Glenn*, 341 Md. 448, 485, 671 A.2d 463, 481 (1996) (citing Standard 3.0 of the ABA Standards for Imposing Lawyer Sanctions, *reprinted in Selected Statutes, Rules and Standards on the Legal Profession*, 287, cmt. at 300 (1987)).[18] It is evident from Judge Geter's findings that Ellison acted with intent to deny Strulson his fees. He further acted with intent to hide from Bar Counsel and Reburn his continuing representation of Moody and the receipt of a fee for that representation. Ellison knew of the details of his representation of Moody and his duty to fulfill the Assignment. The hearing judge found that Ellison knew, or should have known, from the plain text of the Assignment that it was still valid. His subsequent conduct during the investigation demonstrated his intent to obscure the facts from the eyes of Bar Counsel.

There was no actual loss suffered by the Complainant, Strulson, because Moody eventually paid the balance. Although Ellison claims that Moody was happy with his repre-

---

18. The Model Rules were originally adopted in August 1989 by the American Bar Association's House of Delegates and last amended in August 2002. The version of the standards cited in *Glenn* is substantially identical to the current Model Rule 10(c).

sentation, the fact remains that Moody paid $1,022.00 to Strulson out of his personal funds.

Lastly, we examine any aggravating and mitigating factors. Contrary to Bar Counsel's belief that there are no mitigating factors, we credit Ellison with an absence of a prior disciplinary record and relative inexperience in the practice of law after his admission to the Maryland Bar in 2000. In regard to the latter factor, however, we note that Ellison is not necessarily youthful, having received his baccalaureate degree in 1993. Also, we take note that two sets of violations found to have occurred here are predicated on the same conduct—the Rule 16–606 and 16–609 violations and the violation of MRPC 1.15(a).

These mitigating factors, however, do not temper sufficiently the intentional dishonesty exhibited by Ellison throughout his interactions with Strulson over the Assignment and with the Office of Bar Counsel during the investigation. This conduct alone, which cuts to the core of our ethical standards for attorneys, merits disbarment. We find Judge Cathell's words from *Attorney Grievance Comm'n v. Vanderlinde*, 364 Md. 376, 418, 773 A.2d 463, 488 (2001), compelling still:

> Unlike matters relating to competency, diligence and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse. Honesty and dishonesty are, or are not, present in an attorney's character.

"Honesty is of paramount importance in the practice of law." *Attorney Grievance Comm'n v. Blum*, 373 Md. 275, 304, 818 A.2d 219, 237 (2003) (ordering disbarment for attorney that made multiple misrepresentations in "an attempt to obfuscate the truth and save his own skin"). In the absence of more significant mitigating factors than are present here, intentional dishonesty by a lawyer admitted to the Maryland Bar merits disbarment. *Attorney Grievance Comm'n v. Goodman*, 381 Md. 480, 499, 850 A.2d 1157, 1168 (2004) (ordering

disbarment of attorney that committed intentional dishonesty in representing himself as another attorney); *Vanderlinde*, 364 Md. at 419, 773 A.2d at 488 (attorney intentionally embezzled money from her employer); *Attorney Grievance Comm'n v. White*, 354 Md. 346, 367–68, 731 A.2d 447, 459 (1999) (attorney intentionally committed perjury and other misrepresentations).

We thus order that Ellison be disbarred.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(C), FOR WHICH SUM JUDGEMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JARED K. ELLISON.*