974 A.2d 315

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Donald Paul McLAUGHLIN.**

**Misc. Docket AG No. 70, Sept.Term, 2007.**

Court of Appeals of Maryland.

June 18, 2009.

Marianne J. Lee, Asst. Bar Counsel (Melvin Hirshman, Bar Counsel, Atty. Grievance Com'n of Maryland), for Petitioner

Melvin G. Bergman, Greenbelt, MD, for Respondent.

Argued Before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

ADKINS, Judge.

The Attorney Grievance Commission of Maryland, acting through Bar Counsel and pursuant to Maryland Rule 16–751(a),[1] filed a Petition for Disciplinary or Remedial Action against Respondent Donald P. McLaughlin. Bar Counsel charged McLaughlin with violating the Maryland Rules of Professional Conduct ("MRPC") in two matters, the first involving the complaint of client Ebony Fitzgerald and the

---

1. Maryland Rule 16–751(a) provides:
   (a) **Commencement of disciplinary or remedial action.** (1) Upon approval of Commission. Upon approval or direction of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.

second involving a trust account overdraft. Following a July 8, 2008 hearing in the Circuit Court for Prince George's County, the hearing judge issued Findings of Fact and Conclusions of Law that included the following findings in the Fitzgerald matter:

> The facts underlying the alleged violations are, for the most part, undisputed. At the hearing, Respondent, through counsel, admitted that he engaged in professional misconduct but contended that the actions were not willful violations of the Maryland Rules of Professional Conduct (MRPC), as adopted by Maryland Rule 16–812.
>
> *I.  Complaint of Ms. Ebony Fitzgerald*
>
> On or about March 29, 2006, the Respondent was notified by Bar Counsel of the complaint filed by Ebony Fitzgerald (hereinafter referred to as Ms. Fitzgerald). Bar Counsel alleges that the Respondent violated the following Maryland Lawyers' Rules of Professional Conduct:
>
> 1) Rule 1.8    Conflict of Interest[2]
> 2) Rule 1.15    Safekeeping of Property[3]

---

2. **Rule 1.8. Conflict of Interest: Current Clients: Specific Rules.**
    (a) A lawyer shall not enter into a business transaction with a client unless:
    (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;
    (2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction[.]

3. **Rule 1.15. Safekeeping Property.**
    (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
    (b) A lawyer may deposit the lawyer's own funds in a client trust account for the sole purpose of paying bank service charges on that account, but only in an amount necessary for the purpose.

3) Rule 8.4    Misconduct[4]

4) Rule 16–609    Prohibited Transactions[5]

5) Md.Code Ann., Business Occ. & Professions Art., § 10–306[6]

In December 2002, Ms. Fitzgerald retained the Respondent to represent her in her personal injury matter arising from a fire at her apartment in Suitland, Maryland. A contingency fee agreement was signed by Ms. Fitzgerald hiring the Respondent on December 8, 2002. Ms. Fitzgerald was referred to the Respondent by her mother, Antoinette Greene, who worked with Respondent's wife, Annette McLaughlin, at the law firm of Foley and Lardner.

During his representation of Ms. Fitzgerald, the Respondent loaned Ms. Greene, Ms. Fitzgerald's mother, a total of $3,000. Neither Ms. Greene, nor the Respondent, advised Ms. Fitzgerald of the transaction. In January and February of 2003, the Respondent issued checks in the amounts of

---

(c) Unless the client gives informed consent, confirmed in writing, to a different arrangement, a lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred.

4. **Rule 8.4. Misconduct.**
   It is professional misconduct for a lawyer to:
   * * *
   (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
   (d) engage in conduct that is prejudicial to the administration of justice[.]

5. **Rule 16–609. Prohibited Transactions.**
   An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or bearer.

6. **Maryland Code (1989, 2004 Repl.Vol.), Section 10–306 of the Business Occ. & Professions Article.**
   **Misuse of trust money.**
   A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.

$2000 and $1000 payable to Ms. Greene out of his attorney escrow account. At the time, Ms. Greene was not, and had never been, a client of the Respondent. No money was held in trust on behalf of Ms. Greene or his client, Ms. Fitzgerald. By November 2003, Ms. Greene had not yet repaid the $3,000 loan to Respondent.

In November 2003, Ms. Fitzgerald requested from the Respondent a loan in the amount of $600 pending her personal injury matter. Per the testimony of both Ms. Fitzgerald and the Respondent, Ms. Fitzgerald was not aware of the Respondent's loan to Ms. Greene prior to this request. Although the Respondent's loan to Ms. Greene was unrelated to Ms. Fitzgerald's case, the Respondent advised that the only way he would give her the $600 loan would be if she agreed to pay back her mother's $3,000 loan. Ms. Fitzgerald agreed. The Respondent then prepared an assignment transferring a total of $3,600 from any funds received by settlement or judgment in her personal injury matter to himself. On November 13, 2003, the Respondent and Ms. Fitzgerald executed the assignment. The Respondent then issued a check in the amount of $600 payable to Ms. Fitzgerald from his attorney escrow account. Once again, the Respondent was not holding any funds in his attorney escrow account on behalf of Ms. Fitzgerald.

In June 2004, the Respondent made a second loan to Ms. Fitzgerald in the amount of $500. On June 22, 2004, the Respondent issued a check payable to Ms. Fitzgerald from his attorney escrow account in the amount of $500. The Respondent was not holding any funds in his attorney escrow account on behalf of Ms. Fitzgerald. This loan was also to be repaid from any funds received by the settlement agreement or judgment in Ms. Fitzgerald's personal injury matter.

During the course of the Respondent's representation of Ms. Fitzgerald in her personal injury matter, the Respondent also loaned Ms. Fitzgerald's grandmother, Jean Jacobs, a total of $2,245 from his attorney escrow account. The Respondent issued a total of three (3) checks to Ms.

Jacobs from his escrow account: (1) on March 16, 2004, a check in the amount of $995, (2) on March 23, 2004, a check in the amount of $500, and (3) on May 20, 2004, a check in the amount of $750. Ebony Fitzgerald testified that she was unaware of the loans to her grandmother. The Respondent testified that Ms. Fitzgerald was present during the discussions of the loans to her grandmother, Ms. Jacobs. This Court finds the testimony of the Respondent to be more credible. Unlike the loan to Ms. Greene, the advances to Ms. Jacobs were fully disclosed to Ms. Fitzgerald. At the time the Respondent made these loans to Ms. Jacobs, the Respondent was not holding any funds in his escrow account on behalf of Ms. Jacobs. The parties agreed that these loans would also be repaid from any funds received by settlement or judgment in Ms. Fitzgerald's personal injury matter.

In June 2004, Ms. Fitzgerald's personal injury matter was settled for a total of $150,000. The Respondent prepared the settlement statement providing the breakdown of disbursements to be made from Ms. Fitzgerald's settlement funds, and presented it to her on June 22, 2004. Ms. Fitzgerald received $72,269 with $25,000 in annuities on behalf of her two (2) minor children, Sean and Jamie Fitzgerald. The Respondent received $70,000 in legal fees. The settlement statement also provided a deduction of $6,345 for the advances, which included the total amount of the loans the Respondent made to Ms. Greene ($3,000), to Ms. Jacobs ($2,245), and to Ms. Fitzgerald ($1,100).

■ Based on these findings, the Circuit Court drew the following conclusions of law in the Fitzgerald matter:[7]

Pursuant to MRPC 16–757(b), Petitioner has the burden to prove the violations of the cited rules by clear and convincing evidence. This Court has applied that standard and found the following violations.

---

7. We have omitted the Circuit Court's quotation of the text of the various charged rule violations.

\* \* \*

During the course of the Respondent's representation of Ms. Fitzgerald, the Respondent violated MRPC 1.8, 1.15, Maryland Rule 16–609, and Maryland Code Ann., Business Occupations & Professions Art., § 10–306. This Court finds the Respondent did not violate MRPC 8.4 regarding his representation of Ms. Fitzgerald. The pertinent rule sections and facts that support these findings are as follows:

### Maryland Rules of Professional Conduct Rule 1.8—Conflict of Interest

The Respondent entered into loan agreements with Ms. Fitzgerald, Ms. Greene (her mother), and Ms. Jacobs (her grandmother). At no time did the Respondent advise Ms. Fitzgerald to consult with independent counsel regarding the loans or her assignment, nor was she given a reasonable opportunity to do so. At the time the Respondent loaned Ms. Greene and Ms. Jacobs monies, he was not representing them in any client matters. Their agreements were not transmitted in writing, as there were no promissory notes between Ms. Greene and Respondent. The loan to Ms. Greene was not disclosed to Ms. Fitzgerald until she requested her own advance from the expected settlement check, at which time she was unfairly "forced" to repay the loan to her mother. Accordingly, this Court finds that the Respondent violated MRPC 1.8.

### Maryland Rules of Professional Conduct—1.15 Safekeeping Property
### Maryland Code Ann., Business Occupations & Professions Art, § 10–306 Misuse of Trust Money
### Maryland Rule § 16–609—Prohibited Transactions

At the time the advances or loans were disbursed to Ms. Fitzgerald, Ms. Greene or Ms. Jacobs, the Respondent did not hold any funds in his attorney escrow account on behalf of any of the women. The monies advanced to his client, her mother and her grandmother were from deposits entrusted to the Respondent on behalf of other clients or the Respondent's own monies. The loans were made without

the prior consent, authority or consultation of any of the Respondent's other clients. The Respondent kept a single bank account for his practice and did not maintain complete records of account funds. The use of a single account without reference to individual clients made it impossible to match clients with their respective expenses. Accordingly, this Court finds that the Respondent violated MRPC 1.15 and Maryland Code Annotated, Business Occupations and Professions Article § 10–306.

### *Maryland Rules of Professional Conduct 8.4—Misconduct*

This Court does not find that the Respondent violated MRPC 8.4 regarding his representation of Ms. Fitzgerald.

The Circuit Court's findings of facts regarding the Trust Account Overdraft charge were as follows:

### II. *Trust Account Overdraft*

Bar Counsel also alleged that the Respondent violated the following:

1) Rule 1.15    Safekeeping property

2) Rule 8.1    Bar Admission and Disciplinary Matters[8]

3) Rule 8.4    Misconduct

4) Rule 16–607    Commingling of Funds[9]

5) Rule 16–609    Prohibited Transaction

6) Md.Code Ann., Business Occupations & Professions Art., § 10–306

---

**8.    Rule 8.1.    Bar Admission and Disciplinary Matters.**
    An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
    (a) knowingly make a false statement of material fact; or
    (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6.

**9.    Rule 16–607.    Commingling of Funds.**
    a.    **General prohibition.**    An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule 16–604[.]

On May 11, 2006, and May 16, 2006, Bar Counsel received two (2) overdraft notices from Bank of America concerning Respondent's escrow account. The first notice, dated May 4, 2006, reported that two (2) checks, Check No. 4958 for $100 and Check No. 4946 for $365, totaling in the amount of $465 were presented for payment on May 3, 2006. There were insufficient funds at the time of presentation, causing an overdraft on the escrow account in the amount of (negative) -$133.18. The second notice, dated May 8, 2006, reported that one (1) check, Check No. 4977 for $30 was presented for payment on May 4, 2006. Again, there were insufficient funds at the time of presentation, causing an overdraft on the escrow account in the amount of (negative) -$163.19. Bar Counsel contacted the Respondent regarding the overdraft notices. The Respondent explained that his office neglected to promptly deposit the settlement check to cover those payments, but that the overdraft was cured immediately by depositing the related checks. Further investigation by Bar Counsel revealed that the two checks that caused the first overdraft of Respondent's escrow account on May 3, 2006, were issued to medical care providers on behalf of two separate client matters, Sharon Williams and Mr. Cotton/Ms. Ashton, totaling $465. On May 9, 2006, the Respondent deposited a settlement check of a different client, Hakeem Blaize, to cure the overdraft. Accordingly, the settlement funds for Respondent's client Mr. Blaize was used to pay third party providers on behalf of different clients, Ms. Williams and Mr. Cotton/Ms. Ashton, unrelated to Mr. Blaize's matter.

The overdraft notices prompted a more detailed look at the Respondent's accounts. Bar Counsel subpoenaed the Respondent's bank records. The Respondent did not maintain separate operating, escrow and personal accounts from 2002 to 2006. The Respondent used the escrow account to pay for personal and business expenses on a regular basis. The escrow account was used pay bills for the purchase of home furnishings (Marlo Furniture), to pay his employees Marion King and Phillip Gelfo, to pay his monthly rent and

telephone bills, and large disbursements to his wife. The Respondent issued checks to "cash." The Respondent also advanced funds to or on behalf of his clients, and delayed disbursing funds to third party providers on behalf of his clients.

The Respondent did not reconcile his escrow account on a regular basis. If he had reconciled, the Respondent would have discovered the discrepancies. Bar Counsel's accounting expert testified credibly that the Respondent was out of trust on multiple occasions: November 2003, January 2004, February 2004, March 2004, October 2005, November 2005, December 2005, January 2006, April 2006, and May 2006. The Respondent believed he could better track all his checks from his personal injury settlements by having them "under one roof", to wit, his escrow account. On at least two occasions, the Respondent had to transfer money from his personal account to his escrow account to avoid potential shortfalls. The Respondent also indicated that he kept track of the balances constantly by calling the bank's automated accounting system, and checking off the paid checks in his checkbook, thus leaving only his fee in the account when all checks had cleared. In many instances, the Respondent took out less in fees than called for in his retainer agreements.

■ Based on these findings, the Circuit Court drew the following conclusions of law in the Trust Account Matter:

Regarding Bar Counsel's second complaint, this Court finds the Respondent violated MRPC 1.15, 8.1, 8.4, Maryland Code Ann., Business Occupations & Professions Art., § 10–306, and Maryland Rules 16–607 and 16–609. The pertinent rule sections and facts that support these findings are as follows:

*Maryland Rules of Professional Conduct—Rule 1.15 Safekeeping Property*

*Maryland Code Ann., Business Occupations & Professions Art., § 10–306 Misuse of Trust Money*

From 2002 until his retirement from his law practice in 2008, the Respondent commingled his personal funds with the funds of his clients and their third parties in his escrow account. Respondent admitted such at trial. Respondent kept his fees (personal property) in his escrow account and used this money to draw checks payable to his wife, employees and personal creditors. Operating his practice out of a single checking/escrow account led to multiple violations of Rule 1.15. The Respondent was "out of trust" on at least 10 occasions. Expenses from one client were paid from settlement checks of others. Again, it was impossible to associate clients with their respective expenses. Accordingly, this Court finds that the Respondent violated MRPC 1.15 and Maryland Code Annotated, Business Occupations and Professions Article § 10–306.

### *Maryland Rules of Professional Conduct 8.1—Bar Admission and Disciplinary Matters*

### *Maryland Rule of Professional Conduct 8.4—Misconduct*

On May 15, 2006, the Respondent sent a letter to Deputy Bar Counsel, Mr. Grossman, regarding the overdraft complaint. This letter contained three separate misrepresentations addressed below.

*The overdraft was the unfortunate result of a settlement check which an assistant in my office neglected to properly deposit. According to my understanding, the deposit was received and recorded by the bank on the same day as the overdraft, but after the overdraft had been entered. As the bank states, the effected checks were, nevertheless, paid.*

Contrary to the Respondent's explanation of the overdraft, the Respondent's bank records of his escrow account show that there were no deposits received or recorded by Bank of America on the same day as the May 3, 2006, overdraft. The only deposit made after the May 3, 2006, overdraft was on May 9, 2006, in the amount of $6,000 on behalf of Respondent's client, Hakeem Blaize. However, the two (2) checks presented for payment on May 3, 2006, were for two

(2) separate client matters, Sharon Williams and Kenneth Cotton/Sharon Ashton.

> *I had anticipated being out of my office by this time, however, the four attorneys in our suite have a mutual agreement that anyone vacating an office will either obtain a replacement tenant, or pay six months rent. I have been advertising my office for rent in the Prince George's and Montgomery County Bar Bulletins, and had a replacement lined up. In the course of vacating my office, I, among other things, closed my office business checking account. Shortly thereafter, the party who was to rent my office suddenly reneged, and I am currently in the six-month rental mode, but with no office checking account. I attempted to re-instate the account, but it was too late.*

The Respondent's statements clearly give the impression that Respondent's misuse of his escrow account was only for a short period of time while he was winding down his law practice. However, Respondent's bank records of his escrow account with Bank of America revealed that for over four (4) years the Respondent had commingled his funds with those of his clients and used his escrow account to pay for personal and business expenses. The Respondent's bank records clearly show that from at least 2002 to 2006, the Respondent negligently misappropriated funds of clients and their third parties and in some cases, failed to pay third party providers timely on behalf of his clients. The Respondent's bank records also show that Respondent used his escrow account for his personal use, such as to pay bills for the purchase of home furnishings (Marlo Furniture), to pay his employees Marion King and Phillip Gelfo, to pay his monthly rent and telephone bills, and large disbursements to his wife. Moreover, the Respondent's bank records and settlement statements of clients show that, in some cases, the Respondent advanced funds to or on behalf of his clients and delayed disbursing funds to third party providers on behalf of his clients. During the hearing, the Respondent admitted that he had commingled funds in his escrow

account and essentially used his escrow account like his operating account for many years, since at least 2002. Accordingly, the Respondent's statements in his letter of May 15, 2006, to Deputy Bar Counsel regarding the length of time he was using his escrow account like an operating account was false and misleading.

> *Accordingly, I have been forced to make some of my ongoing office expenses; i.e., rent and telephone, from the escrow account, albeit, with my own funds.*

This reply was also a misrepresentation because the Respondent claimed the expenses were paid from his own funds. This statement is impossible to reconcile with the fact that there were two overdrafts, on May 11, 2006, and May 16, 2006, on his escrow account. It is clear that his client's money was no longer held in trust. Again, the Respondent was out of trust on November 2003, January 2004, February 2004, March 2004, October 2005, November 2005, December 2005, January 2006, April 2006, and May 2006. An overdraft did not occur until May 2006 as monies were constantly "floating" in from other clients. Accordingly, this Court finds that the Respondent violated Rules 8.1 and 8.4.

### Maryland Rule 16–607 Commingling of Funds

Respondent failed to maintain the required separate escrow, operating and personal accounts. All of the Respondent's bank notes, including employee salaries, attorney fees, and personal expenses were drawn from a single account, his attorney escrow account. Accordingly, this Court finds that the Respondent violated Rule 16–607.

### Maryland Rule 16–609 Prohibited Transactions

The bank records and testimony from the Attorney Grievance Commission's John Debone revealed multiple made payable to cash (Checks # 4347, 4349, 4411, 4419, 4438, 4444, 4446, 4450, 4494, 4506, 4518, 4529, 3756, 3758, 3760, 3783, 3787, 3822, 4561, 4569, 4602, 4645, 4646, 4717, 4731, 4795, and 4870). From 2005 to 2006, there were cash

withdrawals. Accordingly, this Court finds that the Respondent violated Rule 16–609.

## *MITIGATION*

Despite Respondent's questionable accounting practices, this Court finds it noteworthy that all clients were fully paid. The Respondent did not act with dishonest or selfish motives. No evidence was presented that the Respondent ever shorted a client a penny. In many instances, the Respondent took out less in fees than called for in his retainer agreements. Once expenses were deducted, a net attorney fee rather than gross attorney fee remained. At the hearing, Respondent appeared to recognize the seriousness of his improper use of his escrow account, and was genuinely remorseful. His testimony was that he "felt like a jerk." The Respondent also credibly testified that his original business operating account was closed because he was in the process of winding down his law practice, and planning shortly to vacate his office. However, that process took much longer than expected. The Respondent is now retired.

The Respondent maintained an unblemished record throughout his legal career. There was no evidence of any other overdrafts in 40 years of practice. Upon his first contact from the Attorney Grievance Commission, the Respondent did reopen a separate checking account for operating expenses, albeit too late to avoid the escrow account issues presented herein.

## DISCUSSION

### *Standard Of Review*

In *Attorney Grievance Comm'n v. Ugwuonye,* 405 Md. 351, 368, 952 A.2d 226, 235–36 (2008), we articulated the standard of review we are to employ in deciding attorney grievance matters:

This Court has original and complete jurisdiction over attorney discipline proceedings in Maryland. Even though

conducting an independent review of the record, we accept the hearing judge's findings of fact unless they are found to be clearly erroneous. This Court gives deference to the hearing judge's assessment of the credibility of witnesses. Factual findings by the hearing judge will not be interfered with if they are founded on clear and convincing evidence. All proposed conclusions of law made by the hearing judge, however, are subject to *de novo* review by this Court.

(Citations and internal quotation marks omitted.)

■■■ Neither party took exceptions to the Circuit Court's Findings of Fact and Conclusions of Law. When no exceptions are taken, we "treat the findings of fact as established for the purpose of determining appropriate sanctions, if any." Md. Rule 16–759(b)(2). "We also accept the conclusions of law if they are supported by the factual findings." *Attorney Grievance Comm'n v. Snyder*, 406 Md. 21, 28, 956 A.2d 147, 151 (2008). Our independent review of the record reveals ample support for the Circuit Court's conclusions and we affirm them. We turn next to the question of appropriate sanctions.

### Sanctions

■■■ The Circuit Court found, and McLaughlin's counsel confirmed during oral argument before this Court, that McLaughlin is retired from the practice of law with no intention to reenter. This is not a factor that we consider in crafting sanctions because "our aim is to protect the public and the public's confidence in the legal profession rather than to punish the attorney." *Attorney Grievance Comm'n v. Taylor*, 405 Md. 697, 720, 955 A.2d 755, 768 (2008). "The severity of the sanction depends upon the facts and circumstances of the case, taking account of any particular aggravating or mitigating factors." *Id.* In both the Fitzgerald and the overdraft matters, McLaughlin contends that "under the circumstances of this case, and in light of the strong mitigating circumstances found by the trial court, and his long unblemished record, that a public reprimand would be an appropriate sanction in this matter." Bar counsel argues that McLaughlin's "deceitful conduct in an attempt to conceal his

multiple violations of rules concerning safekeeping clients' properties and their third parties' properties, misuse of clients' funds, and failure to keep an accounting of his escrow account, coupled with his misconduct in entering into a business transaction with a client, warrants a disbarment in this case." Rather than adopting the sanctions proposed by Bar Counsel and McLaughlin, we conclude that an indefinite suspension from the practice of law is the appropriate sanction.

### *Misrepresentations To Bar Counsel*

The chief source of disagreement between McLaughlin and Bar Counsel is the nature of McLaughlin's violation of MRPC 8.4(c) when he made the three misrepresentations to Bar Counsel in his May 15, 2006, letter. Bar counsel characterizes these false statements as "lies" that warrant disbarment and cites three cases in which attorneys were disbarred for 8.4(c) violations: *Attorney Grievance Comm'n v. White*, 354 Md. 346, 731 A.2d 447 (1999), *Attorney Grievance Comm'n v. Ellison*, 384 Md. 688, 867 A.2d 259 (2005), and *Attorney Grievance Comm'n v. Nussbaum*, 401 Md. 612, 934 A.2d 1 (2007). Each of these cases is distinguishable from the one before us.

In *White,* the respondent was an assistant public defender alleged to have represented clients in private practice after the implementation of a ban on such representations. White originally testified in a postconviction proceeding that her post-ban representations stemmed from client contacts arising from before the ban was initiated, which she thought to be permissible. When it was revealed that White contacted victims of a fire regarding a personal injury matter more than a year after the implementation of the ban, she testified in a deposition that she was not acting as a lawyer in this matter, but as a "law clerk." *White,* 354 Md. at 360, 731 A.2d 447 at 455.

We affirmed the following Circuit Court finding:

The [r]espondent obviously could not testify that she had been contacted prior to the date of the ban. Therefore, she

asks this court to believe that a lawyer with her years of experience, who had tried any number of serious felony cases in Prince George's County, and had done so for a number of years, now considered herself a "law clerk" for purposes of obtaining this case. She further asked this court to believe that the attorney to whom the case was being referred was going to divide the fee evenly with someone who was acting as a law clerk in the case. This court cannot and does not accept such an explanation. *Id.* at 361, 731 A.2d at 455. White was found by the Circuit Court to have violated MRPC 8.4(c) in her testimony in both the postconviction proceeding and the deposition. *Id.* at 361–62, 731 A.2d at 455–56. We confirmed that White "clearly violated Rule 8.4(c) because her testimony, made under oath, was, at the very least, dishonest, deceitful, and misrepresented the truth about her involvement in the case." *Id.* at 363, 731 A.2d at 457. This differs from the instant matter where the Circuit Court found that the misinformation in McLaughlin's letter was not dishonest or deceitful. Indeed, the Circuit Court noted that McLaughlin's testimony about winding down his business as an explanation for the misappropriation was credible. We deduce from the Circuit Court's opinion that its finding that McLaughlin acted "negligently" applies not just to his misappropriation of client funds, but to his misrepresentations as well.

In *Ellison*, the MRPC 8.4(c) violation arose out of an Assignment and Authorization agreement in which Ellison agreed to pay a physical therapist who had treated Ellison's client in a personal injury matter. Ellison later rescinded the Assignment in a letter which stated that he was no longer representing his client. We held that there was "ample evidence" to support the Circuit Court's conclusion that the letter "misrepresented his ongoing representation of [his client]" and that "this letter's main purpose was to declare erroneously the Assignment 'null and void' and allow Ellison to avoid paying [the physical therapist] under the Assignment" in violation of MRPC 8.4(c). *Ellison*, 384 Md. at 711, 867 A.2d at 272. We also affirmed the Circuit Court's finding that

Ellison misrepresented these facts to Bar Counsel's investigator. *Id.*

Our discussion of Ellison's conduct reveals a very different *mens rea* from the case at hand. The Circuit Court here found that McLaughlin was negligent and "did not act with dishonest or selfish motives" in connection with his misappropriation and the corresponding misrepresentation, whereas in Ellison, we found:

> [Ellison's] transgressions include dishonesty with and misrepresentations to Bar Counsel in connection with this disciplinary matter, improper contingency fee arrangements, improper handling of property belonging to a third party assignee, various Maryland Rules violations regarding the handling of funds in attorney trust accounts, and attorney misconduct involving dishonesty and the administration of justice.

> In reviewing Judge Geter's findings, we find that Ellison **acted intentionally, the "most culpable mental state," because he acted with a "conscious objective or purpose to accomplish a particular result."** *Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 485, 671 A.2d 463, 481 (1996) (citing Standard 3.0 of the ABA Standards for Imposing Lawyer Sanctions, *reprinted in Selected Statutes, Rules and Standards on the Legal Profession,* 287, cmt. at 300 (1987)). It is evident from Judge Geter's findings that Ellison acted with intent to deny [the physical therapist] his fees. He further acted with intent to hide from Bar Counsel and [Bar Counsel's investigator] his continuing representation of [his client] and the receipt of a fee for that representation. Ellison knew of the details of his representation of [his client] and his duty to fulfill the Assignment. The hearing judge found that Ellison knew, or should have known, from the plain text of the Assignment that it was still valid. His subsequent conduct during the investigation demonstrated his intent to obscure the facts from the eyes of Bar Counsel.

*Id.* at 715, 867 A.2d at 274–75 (emphasis added, footnote omitted). Ellison's absence of a prior disciplinary record and relative inexperience were the only mitigating factors, and we held that they did not "temper sufficiently the intentional dishonesty exhibited by Ellison throughout his interactions with [the physical therapist] over the Assignment and with the Office of Bar Counsel during the investigation." *Id.* at 716, 867 A.2d at 275. We also held that "[i]n the absence of more significant mitigating factors than are present here, intentional dishonesty by a lawyer admitted to the Maryland Bar merits disbarment." *Id.* This presented a much different factual scenario from the instant matter where the Circuit Court found more than a half dozen mitigating factors that *did* temper McLaughlin's conduct by suggesting that he did not act intentionally in his misrepresentations to Bar Counsel.

In *Nussbaum,* we considered the following factual scenario, which is very similar to the one before us:

> Respondent wrote checks from his escrow account and deposited the funds into his operating account in order to cover personal expenses. When it came time for Respondent to disburse funds from the escrow account to proper payees, he would "borrow" funds from other clients, from personal loans improperly deposited into the escrow account, or from rents received for office space in the building housing his law office.

*Nussbaum,* 401 Md. at 639, 934 A.2d at 16. We agreed with the hearing judge "that Respondent's conduct was dishonest and deceitful in violation of Rule 8.4(c) in that he misappropriated client funds and misrepresented to clients that the funds were properly safeguarded." *Id.* at 642, 934 A.2d at 18. Although the Respondent asked us to consider as mitigating factors "that no client was explicitly misled or suffered any financial harm, that all client obligations were timely discharged, and that Respondent never intended to deprive any client of the timely access to escrow funds or to defraud any client[,]" we nevertheless found that his "actions were dishonest, deceitful, and motivated by his own pecuniary interests." *Id.* at 644, 934 A.2d at 20.

**324**

Writing for the Court, Judge Battaglia observed: "We have repeatedly stated that the misappropriation of entrusted funds is an act infected with deceit and dishonesty, and, in the absence of compelling extenuating circumstances justifying a lesser sanction, will result in disbarment." *Id.*, 934 A.2d at 19 (citation and international quotation marks omitted).

■ Nussbaum cited a number of cases for the proposition that not all findings of the misuse of client funds have resulted in disbarment. Nonetheless, we recognized that the key to imposing sanctions in misappropriation cases is the attorney's simultaneous violation of Rule 8.4(c). We noted that "[i]n every case cited, except *[Attorney Grievance Comm'n v. Calhoun,* 391 Md. 532, 575, 894 A.2d 518, 544 (2006)], however, the hearing judge did not find a violation of MRPC 8.4(c)."[10] *Id.* at 646, 934 A.2d at 21. We summarized and distinguished *Calhoun* as follows:

> In the singular case in which a violation of 8.4(c) was found and disbarment was not ordered, *Calhoun*, 391 Md. at 532, 894 A.2d at 518, the respondent was charged with violating multiple rules of professional conduct, including 8.4(c), in connection with her representation of a client in a sexual harassment suit. The hearing court found that Calhoun had commingled trust funds and personal funds by failing to deposit two $5,000.00 payments for fees and an $8,000.00 settlement check into a properly designated attorney trust account. The hearing judge found that Calhoun had misled her client concerning legal fees and costs owed by failing to keep him informed of the accrual of those fees and costs in a timely fashion, as was required by her representation agreement. Specifically, the court found

---

**10.** We note that the 8.4(c) violations in *Nussbaum* and *Calhoun* stemmed from misrepresentations to clients, whereas here, the misrepresentation was to Bar Counsel. Neither the Rule nor our modern jurisprudence, however, draw sanction-related distinctions based on this difference. In addition, we held that Nussbaum's knowing misrepresentation of the legitimacy of his ledger entries was, indeed, a misrepresentation to Bar Counsel that violated the MRPC, albeit under MRPC 8.1(a) rather than 8.4(c). *Attorney Grievance Comm'n v. Nussbaum*, 401 Md. 612, 641, 934 A.2d 1, 18 (2007).

that she "mislead by silence and lack of communication," *id.* at 548, 894 A.2d at 527, and that she violated 8.4(c) by her "failure to communicate properly."

*Id.* at 646–47, 934 A.2d at 21. In determining Calhoun's sanction, "this Court noted that while the hearing judge did find that respondent violated MRPC 8.4(c), he did not find specifically that respondent engaged in dishonest or fraudulent conduct, and focused on the respondent's treatment of the $8,000.00 in settlement funds." *Id.* at 647, 934 A.2d at 21 (citation and internal quotation marks omitted). "We noted that the hearing court did not find that Calhoun had intentionally misappropriated the settlement funds, but rather that the facts indicated that she may have believed, albeit erroneously, that the settlement funds were owed to her to cover fees and costs associated with representation." *Id.* at 647, 934 A.2d at 21. We concluded in *Nussbaum:*

> The facts of the present case are different from those of *Calhoun* in two very important respects. First, in the present case the hearing court found by clear and convincing evidence that Respondent "engaged in dishonesty and deceit/misrepresentation." Second, there are no factual findings in the present case to support the premise that client funds were unintentionally or accidentally misappropriated. In *Calhoun,* the attorney had properly incurred fees and costs associated with the representation of her client; her violation of MRPC 8.4(c) was a result of her lack of diligence in communicating these expenses to her client and following appropriate procedures in obtaining payment. **The violations in the present case do not result from the Respondent improperly utilizing client funds which he believed he had earned for services rendered; rather, he *knowingly* and *intentionally* misused client funds over a period of two years in order to cover personal expenses unrelated to his representation of those clients.**

*Id.* at 647, 934 A.2d at 21–22 (emphasis added, italics in original).

We consider McLaughlin's conduct closer to the "lack of diligence" exercised by the attorney in *Calhoun* than the intentional conduct found in *Nussbaum*. *Nussbaum* and *Calhoun* demonstrate that an attorney's mental state is a significant enough factor in misappropriation cases to merit a sanction less than disbarment, even when there was a corresponding MRPC 8.4(c) violation. The Circuit Court found that McLaughlin "did not act with dishonest or selfish motives" and "appeared to recognize the seriousness of his improper use of his escrow account, and was genuinely remorseful" at his hearing.

### The Importance Of Negligence For The Underlying Misappropriation

In *Nussbaum*, Judge Battaglia also explained that "we have declined to order disbarment in cases where the misappropriation of funds was due to negligence, rather than intentional misconduct" but that indefinite suspension was not the appropriate sanction for Nussbaum because his "actions were intentional, not negligent." *Id.* at 648, 934 A.2d at 22.

One such case in which the attorney's actions were negligent was *Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 872 A.2d 693 (2005). There, we held that an indefinite suspension with the right to reapply after thirty days was the appropriate sanction "where there was a misappropriation of trust account funds based upon the lawyer's ineffectual accounting procedures and theft of funds by an employee." *Id.* at 377, 379, 872 A.2d at 714, 716. Though no employee theft was involved in the instant matter, McLaughlin also presents a case of misappropriation from "questionable accounting practices[.]" In *Zuckerman*, we considered the fact that there was "no evidence that Mr. Zuckerman acted with an intent to steal money, nor did he benefit personally from the misappropriation of the funds" and that "none of his clients suffered any financial loss[.]" *Id.* at 379, 872 A.2d at 716. Likewise, in the instant matter, the Circuit Court found that "[n]o evidence was presented that the Respondent ever shorted a client a penny. In many instances, the Respondent took out less in

fees than called for in his retainer agreements. Once expenses were deducted, a net attorney fee rather than gross attorney fee remained." *See also Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 491, 671 A.2d 463, 484 (1996) (citing ABA standard indicating that "[s]uspension is generally appropriate when a lawyer . . . should know that he is dealing improperly with client property and causes . . . potential injury to a client").

By relying on our reasoning in *Nussbaum,* Bar Counsel has actually identified the very exceptions to disbarment that apply to McLaughlin. First, unlike the disbarred attorneys in *White, Ellison,* and *Nussbaum,* McLaughlin was found to have acted negligently rather than intentionally. In accord with our discussion in *Zuckerman,* the fact that McLaughlin was found to have acted with negligence in the misappropriation of client funds is a factor that weighs in favor of suspension, rather than disbarment. With regard to McLaughlin's 8.4(c) violation, the Circuit Court found that McLaughlin "credibly testified that his original business operating account was closed because he was in the process of winding down his law practice, and planning shortly to vacate his office. However, that process took much longer than expected." This lends further credence to the notion that McLaughlin's misrepresentations to Bar Counsel were misunderstandings rather than abject lies.

In crafting this sanction, we are mindful of the impropriety stemming from McLaughlin's loans to Fitzgerald and her kin. However, our independent examination of the record sheds light on the Circuit Court finding that Fitzgerald was unfairly forced to enter the loan and payback agreement with McLaughlin. During cross-examination before the Circuit Court, Fitzgerald indicated that the loan, its terms, and the pressure she felt in agreeing to them were a function of her dire financial straits at the time:

> [McLaughlin's Counsel]: When you went to Mr. McLaughlin to borrow money, why did you go to him as opposed to [a] family member?

[Fitzgerald]: Because the only closest family members are my mom and my grandmother, which they are not financially stable. And that was my last resort where I would be able to get that amount of money from[.]

[McLaughlin's Counsel]: Did you go to Mr. McLaughlin and tell him you needed money?

[Fitzgerald]: Yes, I told him I was on the verge of being put out of my apartment.

[McLaughlin's Counsel]: What would you have done if Mr. McLaughlin wouldn't loan you money?

[Fitzgerald]: Then I would have had to move.

Fitzgerald testified that McLaughlin proposed waiting for her settlement rather than loaning her the money, but that her circumstances would not permit her to wait: "He explained to me when I was asking for the loan, he was stating, you know, your settlement should be coming to a closure soon. And, you know, I'm stating to him that my rental office is not going to wait. And I had my documents with me being evicted and everything."

Fitzgerald also discussed the interests at play that led to her agreement to pay back her mother's loan:

[McLaughlin's Counsel]: Well, did you understand you didn't have to agree to pay your mother's money back? You understood that, didn't you?

[Fitzgerald]: Yeah, but I also understood that I would be put out if I didn't agree to pay that money back.

[McLaughlin's Counsel]: You understood that Mr. McLaughlin would not loan you the money without having some guarantee that he was going to be paid back from your mom, also, who apparently had not honored her agreement, is that correct?

[Fitzgerald]: Yes, that's correct.

We quote this testimony not to excuse McLaughlin for his inappropriate client dealings and his failure to direct Fitzgerald to independent counsel, but to show that McLaughlin made the loan upon request from Fitzgerald, in light of her

pressing circumstances. This is in keeping with the Circuit Court's finding that McLaughlin violated rules related to conflict of interest in the Fitzgerald matter, but that this conduct did not rise to the level of an MRPC 8.4 violation. The nature of this misconduct supports a suspension sanction. *See Attorney Grievance Comm'n v. Webster,* 348 Md. 662, 679, 705 A.2d 1135, 1143 (1998) (issuing sanction of suspension for trust account violations paired with violation of the rules related to conflict of interest).

For the above reasons, we are persuaded that indefinite suspension is the appropriate sanction. We shall so order.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761. JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST DONALD P. MCLAUGHLIN FOR THE SUM OF SUCH COSTS.**

HARRELL, J., dissents and files opinion in which BATTAGLIA and BARBERA, JJ., join.

Dissenting Opinion by HARRELL, Judge, which BATTAGLIA and BARBERA, JJ., join.

I dissent from the sanction of indefinite suspension. I would disbar McLaughlin.[1]

As regards the Fitzgerald complaint, McLaughlin was found by Judge Rattal apparently to have mis-appropriated intentionally trust monies. He found that McLaughlin violated MRPC 1.15 (Safekeeping Property), Maryland Code (1989, 2004 Repl.Vol.), Business Occupations and Professions Article, § 10–306 (Misuse of Trust Money), and Md. Rule 16–609

---

1. It is probably of no great moment to McLaughlin, as a practical matter, whether we disbar or suspend him indefinitely. He claims to have retired entirely from the practice of law. Nonetheless, it is the precedential impact of the Majority's opinion that moves me to express a dissent.

(Prohibited Transactions) by (a) making loans from funds in his trust account that belonged to other clients; (b) without the consent of the other clients; and (c) without maintaining complete accounting records of the funds in his trust account. In his analysis of whether violations occurred, Judge Rattal neither found nor concluded that the violations occurred as the consequence of merely negligent conduct.[2],[3]

Compounding the enduring misappropriation scheme presented in this record (taking into account the so-called negligent misappropriation portion reflected in the hearing judge's separate analysis of Bar Counsel's overdraft complaint) is McLaughlin's intentionally "false and misleading" "misrepresentations" to Bar Counsel.[4] Considered together, we are confronted with intentional misappropriation, negligent misappropriation, obvious conflict of interest, and intentional misrepresentations to Bar Counsel in the course of an investigation. This array, I think, cuts to the core of what we should expect minimally from a Maryland lawyer. "Candor and truthfulness are two of the most important moral character traits of a lawyer." *Attorney Grievance Commission v. Myers*, 333 Md. 440, 449, 635 A.2d 1315, 1319 (1994). Even

---

2.  Judge Rattal's general findings in mitigation do not render unintentional or negligent the misconduct regarding the Fitzgerald complaint. The absence of "selfish or dishonest motives" generally, as found there by the hearing judge, may influence the sanction, but have no bearing on whether the violative conduct was unintentional or negligent in the first instance.

3.  In contradistinction, when addressing Bar Counsel's separate overdraft complaint, the hearing judge pointedly proclaimed that the misconduct of commingling and expenditures there reflected McLaughlin "negligently misappropriat[ing] funds of clients and their third parties." Because the hearing judge made no such qualified finding or conclusion that I could find with regard to the Fitzgerald complaint, I am unable to infer, as perhaps the Majority opinion does, that that conduct represented a negligent misappropriation.

4.  Again, finding generally as a mitigator that McLaughlin "did not act with dishonest or selfish motives" does not translate inexorably to his conduct being less than intentional (except perhaps as to the expressly found "negligent misappropriations" regarding the overdraft complaint).

where no client suffers actual financial loss, "misappropriation is a most egregious violation ... because ... [t]he rule is concerned with the risk of loss, not only the actual loss." *Attorney Grievance Commission v. Zdravkovich,* 381 Md. 680, 704, 852 A.2d 82, 96 (2004), quoting *Attorney Grievance Commission v. Glenn,* 341 Md. 448, 489, 671 A.2d 463, 483 (1996).

I would disbar.

Judges BATTAGLIA and BARBERA join this dissent.