50 A.3d 1166

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

David A. ROSS.

Misc. Docket AG No. 19, Sept. Term, 2011.

Court of Appeals of Maryland.

Aug. 21, 2012.

52

54

Raymond A. Hein, Deputy Bar Counsel (Glenn M. Grossman, Bar Counsel, JaCina N. Stanton, Asst. Bar Counsel, Attorney Grievance Commission of Maryland), for petitioner.

David Arthur Ross, Washington Grove, MD, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

McDONALD, J.

An attorney has a duty not only to represent a client diligently, but also to act as a fiduciary with respect to client funds entrusted to the attorney and to maintain appropriate documentation as to the attorney's services, fees, and disposition of client funds. That is true whether the client is a saint, a sinner, or someone in between. This case concerns the manner in which relatively new attorney, David A. Ross, handled client funds, billing, and communications for several matters in which he represented Brian Murphy, who had been convicted of possession of child pornography shortly before he first retained Mr. Ross to appeal that conviction.

The Attorney Grievance Commission (the "Commission") charged Mr. Ross with violating numerous provisions of the Maryland Lawyers' Rules of Professional Conduct ("MLRPC"), several other Maryland Rules, and Maryland Code, Business Occupations & Profession Article ("BOP"), § 10–306. The alleged violations all concern the manner in which Mr. Ross handled client funds, assessed and collected fees, and maintained records relating to his representation of Mr. Murphy. Pursuant to Maryland Rules 16–752(a) and 16–757, we referred the matter to Judge Sharon V. Burrell of the Circuit Court for Montgomery County to conduct a hearing and to provide findings of fact and recommended conclusions of law.

The record developed before Judge Burrell during a three-day hearing offers two starkly different accounts of the attorney-client relationship. While there is relatively little common ground in these two accounts, both apparently agree that Mr. Ross was diligent in his representation of Mr. Murphy and achieved some degree of success on his client's behalf and both versions agree that Mr. Ross was charged with establishing a family trust of some kind on behalf of Mr. Murphy and his wife. In one version, offered by Mr. Murphy and his wife, Mr. Ross took advantage of them to divert $93,000 entrusted to him for the family trust and attempted to justify that misappropriation with unreasonable and untimely bills for past

services. In the other account, offered by Mr. Ross and supported in some respects by several friends with a variety of ties to his practice, the funds were always intended and, in the end, proved inadequate recompense for Mr. Ross' services in other matters related to the child pornography charges; in this account, his billing records were "recreated" after the fact because the originals were allegedly stolen by Mr. Murphy and the ledger for his client trust account similarly disappeared.

 Judge Burrell had the opportunity to observe the witnesses and assess their credibility. She largely credited the client's version of events and concluded that Mr. Ross had committed all the violations charged, including violations of MLRPC 1.4 (communication), 1.5 (fees), 1.15 (safekeeping property), and 8.4 (misconduct); Maryland Rules 16–604 (trust accounts—required deposits), 16–606 (name and designation of trust account), 16–606.1 (trust account record keeping), and 16–609 (prohibited transactions); and BOP § 10–306 (misuse of trust money). Mr. Ross filed 25 numbered exceptions [1] to both the findings of fact and conclusions of law, and raised

---

1. Those exceptions total 224 pages, including exhibits. While many of the exhibits that Mr. Ross attached to his exceptions and other post-hearing filings were part of the record before Judge Burrell, many were not and the Commission has filed a motion to strike those exhibits.

 On occasion, there may be good cause for our consideration of evidence not presented to the hearing judge. *Attorney Grievance Comm'n v. Lee*, 387 Md. 89, 116, 874 A.2d 897 (2005). In such circumstances, a respondent must put forth, with specificity, facts that were not or could not have been adduced at the hearing. *Attorney Grievance Comm'n v. Lee*, 393 Md. 546, 560, 903 A.2d 895 (2006). This Court may then elect to remand the case for the hearing judge to consider that evidence.

 In his post-hearing filings, Mr. Ross does not allege, with specificity, any facts that he did not already present at the hearing. The exhibits he has submitted that were not part of the record before the hearing judge bear little relation to the disciplinary charges against him and, at best, are an effort to attack the character and credibility of his former client. We decline to consider them further or to remand this matter to the hearing judge. We grant the Commission's motion as to the exhibits other than the dictionary definitions, website printouts, and other exhibits that Mr. Ross submitted to illustrate his legal arguments.

other legal arguments attacking the disciplinary proceedings against him. The Commission did not file any exceptions.

From our review of the record, we cannot say that Judge Burrell's assessment of the facts was clearly erroneous.[2] Those findings lead to the conclusion that Mr. Ross misappropriated client funds and created false records in response to a disciplinary investigation. In such a case, disbarment is the only appropriate discipline. We elaborate below.

## Background[3]

Mr. Ross was admitted to the Maryland Bar in June 2007. He started a solo practice, operating out of a Rockville office for two years and later out of his home in Washington Grove. Less than a year after he was admitted to practice, Mr. Ross commenced the representation that has resulted in this proceeding.

*Introduction to Client*

Shortly after he began practicing law, Mr. Ross met, through a mutual acquaintance, an attorney named Constance Camus. One of Ms. Camus' clients was Brian Murphy, a former Maryland State Police trooper who had been charged with multiple counts of possession of child pornography. While represented by Ms. Camus, Mr. Murphy was found guilty on five counts of that offense in February 2008 in the District Court of Maryland sitting in Washington County. Ms. Camus noted an appeal on Mr. Murphy's behalf to the Circuit Court for Washington County, where the charges would be tried *de novo*.

---

**2.** *See Attorney Grievance Comm'n v. Fox*, 417 Md. 504, 509, 11 A.3d 762 (2011) (hearing judge's findings of fact are accepted unless clearly erroneous); Maryland Rule 16–759(b)(2).

**3.** Unless specifically noted otherwise, the facts recited in this section are derived from Judge Burrell's findings and the stipulated facts and documents submitted by the parties. In his exceptions, Mr. Ross did not explicitly distinguish those exceptions addressed to the hearing judge's findings of fact from those addressed to her conclusions of law. To the extent that an exception appears to be addressed to a finding of fact, it will be discussed in this section.

In March 2008, Ms. Camus introduced Mr. Ross to Mr. Murphy. She believed that Mr. Ross, who had some past experience in financial matters,[4] could help Mr. Murphy and his wife protect their assets and also assist with the appeal. During several telephone calls, Mr. Ross described to Mr. Murphy the legal assistance he could provide. He also began doing some legal research related to the case, although he had not yet entered into an agreement to represent Mr. Murphy.

*Retainer Agreement concerning Criminal Matter and Initial $5, 000 Payment*

Judge Burrell found that Mr. Murphy did not agree to retain Mr. Ross until May 8, 2008, when the two signed a retainer agreement (the "Agreement") for services "in the criminal matter currently pending before the Circuit Court of Washington County[.]" The Agreement stated that Mr. Murphy would be billed at the rate of $250 per hour for Mr. Ross' services and also included rates of $150 per hour for paralegal work and $75 per hour for the work of administrative personnel, all "for legal services that have been, or will be, performed by the Firm in this matter." The Agreement did not mention representation or work by any attorney other than Mr. Ross. The Agreement indicated, among other things, that time charges would be recorded in increments of 1/10 of an hour and that billing statements would be sent monthly.

In accordance with the Agreement, Mr. Murphy paid an initial retainer of $5,000 with a personal check bearing the memo notation "legal retainer fee." Although the Agreement recited that the initial retainer would be deposited in "the Firm's Trust Account," Mr. Ross deposited the check into his personal checking account.

At the hearing before Judge Burrell, Mr. Ross testified that he did not deposit the initial retainer check in the trust account because he had already earned that amount for ser-

---

4. According to his testimony at the hearing Mr. Ross had held several positions related to accounting and finance before he became an attorney. He also had obtained an L.L.M. in tax law from Georgetown University Law Center.

vices performed prior to the Agreement. Judge Burrell, however, found that Mr. Murphy paid the $5,000 solely in anticipation of future legal services and that Mr. Ross was not owed any fees prior to its payment. She relied on the portion of the Agreement drafted by Mr. Ross, which stated that "[t]he initial retainer payment, and any additional retainer payments that are requested by the Firm, will be deposited in the Firm's Trust Account, from which withdrawals will be made periodically as fees are earned and costs are incurred." In addition, the Agreement further provided that representation would begin when the initial retainer was paid. Given the explicit provisions of the Agreement, Judge Burrell determined that Mr. Murphy had not agreed to pay for whatever previous work Mr. Ross had performed and did not intend his $5,000 check to be deposited in Mr. Ross' personal account as a payment for services previously provided. Mr. Ross did not enter his appearance in the criminal case as Ms. Camus' co-counsel until May 13, 2008.

 Mr. Ross excepts to this finding, claiming that Mr. Murphy had authorized him to begin working prior to May 8 and that the $5,000 payment had been earned prior to its receipt. Before May 8, he asserts, he had prepared for trial and related pretrial hearings, as well as drafted a memorandum to respond to a State discovery motion.[5] He contends that the Agreement had actually been drafted and delivered to Mr. Murphy before May 8, but was "re-prepared" on that date to reflect a small change. This is contradicted, however, by a May 8 "contact sheet"—described by Mr. Ross as a contemporaneous recording of client interactions—on which he had noted "Write retainer letter." Accordingly, Judge Burrell did

---

5. Mr. Ross asserts that Joseph Michael, the deputy state's attorney who prosecuted the case, testified at the hearing that he had worked with Mr. Ross on the case prior to May 8, 2008. A review of the hearing transcript reveals that Mr. Michael testified that he communicated with Mr. Ross about the case prior to a *May 13* hearing—when Mr. Ross entered his appearance in the case—but could not otherwise place those communications in relation to May 8.

not find credible [6] Mr. Ross' testimony that the Agreement had been prepared prior to May 8, that it did not mean what it said with respect to the initial retainer, and that the $5,000 check was intended to pay for past services. Rather, she determined that the representation had commenced when the Agreement was signed. This finding was not clearly erroneous.

*Representation on Other Matters; Second Payment of $4,565*

In addition to the criminal case, Mr. Ross also agreed to represent Mr. Murphy in an administrative proceeding to review a determination by the Washington County Department of Social Services ("DSS") that Mr. Murphy was responsible for child sexual abuse. The administrative hearing was scheduled for June 4, 2008, in Hagerstown.

At about the same time, Mr. Ross also agreed to assist Mr. Murphy and his wife, Dawn Murphy, with a contract dispute they had with Richmond American Homes concerning construction of a new house in West Virginia and with the establishment of a family trust. The family trust was apparently intended to shield their assets from future law suits and to protect funding for the purchase of the West Virginia residence.

There were significant developments in both the criminal case and the DSS administrative hearing on June 4, 2008. On that day, pursuant to an agreement with the State's Attorney, Mr. Murphy dropped his *de novo* appeal of the criminal case in the circuit court. In exchange, the State's Attorney agreed

---

**6.** Mr. Ross generally excepts to Judge Burrell's adverse findings as to his credibility. Noting his multiple post-graduate degrees and experience as a forensic auditor, he argues that his character is "exemplary" and that it was clear error for Judge Burrell to disbelieve any portion of his testimony. Mr. Ross' educational and other achievements notwithstanding, "the hearing judge is entitled to weigh the evidence, assess the witnesses' credibility, and resolve any conflict in the evidence." *Attorney Grievance Comm'n v. Keiner*, 421 Md. 492, 505, 27 A.3d 153 (2011). The hearing judge was under no obligation to accept his testimony.

not to pursue additional criminal charges arising from allegations that Mr. Murphy had abused a child of a family friend.[7] On that same day in the administrative proceeding, Ms. Camus requested and was granted permission to withdraw as counsel, and the hearing was postponed to July 29, 2008. Mr. Ross became Mr. Murphy's sole counsel of record in that matter.

At that time, Mr. Murphy gave Mr. Ross another personal check, this time in the amount of $4,565. According to memo notations written on the check, the payment covered "hotel, DSS, RAH, Trust, Prop. Release." Of that total, $65 was intended to reimburse Mr. Ross for his hotel stay in Hagerstown the night before the DSS hearing originally scheduled for on June 4. The remaining $4,500 was payment of attorney's fees for legal services related to various matters: representation in the DSS hearing; representation of Mr. Murphy and his wife in the contract dispute with Richmond American Homes ("RAH"); establishment of a trust for the Murphys; and obtaining a release of Mr. Murphy's property held by the Maryland State Police. Unlike the "criminal law matter" referenced in the original retainer agreement, these services were not the subject of a written fee agreement. Judge Burrell found that Mr. Ross had not communicated the basis for or rate of his legal fees to Mr. Murphy or his wife for any services outside of the "criminal law matter" referenced in the original Agreement.

As he had done with the initial $5,000 retainer, Mr. Ross deposited this check in his personal bank account rather than in an attorney trust account. Although Mr. Ross produced no time records or other documentation that the $4,500 was payment for services provided before the payment,[8] he con-

7. This agreement was memorialized in a jointly filed Notice of Dismissal of Appeal.

8. Mr. Ross testified that he maintained client ledgers and trust account records in a binder at his Rockville office. He claimed that this binder, along with other boxes containing records in the Murphy case, disappeared after he moved from that office on March 28, 2010. Mr. Ross

tended that he had earned this payment in full at the time it was made as a result of time he had spent negotiating the agreement with the State's Attorney concerning Mr. Murphy's appeal and the potential new criminal charges; responding to a discovery motion; preparing for a criminal appeal; and attending a brief DSS hearing on June 4.

Judge Burrell concluded that it was "not clear" that Mr. Murphy paid that sum in anticipation of future services, noting that it was undisputed that Mr. Ross had prepared for both the criminal matter and DSS hearing prior to June 4. Accordingly, she could not find by clear and convincing evidence that Mr. Ross had not earned that amount of the second check at the time of payment. Accordingly, she did not find that this check should have been deposited into Mr. Ross' trust account.

*"Case Status Letter" dated June 30, 2008*

■ Mr. Ross produced no time records or other contemporaneously-created records to document that he had provided nearly $10,000 of legal services prior to June 4. Before Judge Burrell he relied on a four-page, unsigned "Case Status" letter addressed to Mr. Murphy dated June 30, 2008. The letter states that Mr. Ross expected to work "in excess of 150 hours over the next several weeks in preparation" for the upcoming DSS hearing and that the total bill "could exceed $50,000." Attached to the letter was an invoice, also dated June 30, listing fees and expenses totaling $24,857.80, less the two credited payments amounting to $9,565 for a balance due of $15,292.80. Mr. Murphy testified that he never received the

---

and his girlfriend, Jill Pumphrey, asserted that Mr. Murphy—who was among those assisting with the move—must have stolen the binder and the records at that time, though neither actually saw him take the materials and Mr. Murphy denied doing so.

Mr. Ross did not file a police report about the alleged theft. He stated that he chose not to do so after a member of Bar Counsel's staff told him that it would be considered a retaliatory action against his client and he would be sanctioned. Bar Counsel denied that any of its employees had such a conversation with Mr. Ross. Mr. Ross has not identified the individual who allegedly made this statement or produced other evidence that such a conversation took place.

Judge Burrell declined to find that Mr. Murphy had stolen the items.

letter or the invoice from Mr. Ross and that they did not accurately reflect the status of the representation or the fee obligations that had been communicated to him. Judge Burrell found that Mr. Ross fabricated these documents in 2010 to defend against the attorney grievance complaint.[9]

In his exception to the finding that he created the "Case Status" letter and invoice as an after-the-fact response to the attorney grievance complaint, Mr. Ross faults Judge Burrell for crediting Mr. Murphy's testimony instead of his own.[10] Mr. Ross has provided no other documentation of the many hours he claims to have spent on Mr. Murphy's case prior to the June 4 payment. Based on our review of the documentary evidence and the testimony of Mr. Ross and Mr. Murphy, we cannot say that Judge Burrell's determination that the case status letter and invoice had been fabricated is clearly erroneous.

*DSS Administrative Hearing—July 29, 2008*

The DSS administrative hearing concerning alleged child abuse by Mr. Murphy was held on July 29, 2008. It resulted in a favorable determination for Mr. Murphy that no child sexual abuse had occurred. Mr. Ross testified that he spent a significant amount of time preparing for this proceeding. However, he did not produce, and Judge Burrell found that he did not maintain, contemporaneously-created records that doc-

---

**9.** Judge Burrell noted that the proffered "Case Status" letter and invoice listed different addresses for Mr. Ross; the letter lists his Rockville office address and the invoice lists his Washington Grove home address. Judge Burrell did not believe that, after three months in his Rockville office, Mr. Ross would send invoices using his home address. Mr. Ross attributes the discrepancy in addresses to the spreadsheet software that he used.

**10.** Mr. Ross' exceptions are replete with strongly worded attacks upon Mr. Murphy's character and explicit references to allegations or evidence in various criminal proceedings. Mr. Ross contends that, given Mr. Murphy's conviction for possession of child pornography, it was clear error for the hearing judge to believe any of his testimony. We note, however, Judge Burrell was fully aware of allegations against Mr. Murphy and his background when she heard his testimony and was able to consider that information, along with other testimony and exhibits, in making findings of fact.

umented the extraordinary number of hours he later claimed to have worked.

*Family Trust and $85,000 Bank Check*

Mr. and Mrs. Murphy both testified that, during June and July 2008, they discussed with Mr. Ross the establishment of a "personal trust" into which the couple would place their financial assets. The Murphys were concerned about possible civil litigation brought by the family that had accused Mr. Murphy of child sexual abuse and believed that a trust would protect their savings from possible future judgments. Later, Mr. Ross and the Murphys discussed a trust as a possible vehicle for securing funds for the Murphys' future children or for the purchase of a home. In July 2008, Mr. Ross drafted a "Trust Indenture" designed so that the Murphys' parents could, using the Murphys' money, potentially purchase a home and obtain a mortgage on the couple's behalf. Mr. Ross met with Mrs. Murphy and her father to discuss the trust, and later prepared another draft of the document.

On July 24, 2008, the Murphys withdrew $85,000 from a joint bank account at the State Employees Credit Union ("SECU") and purchased an official bank check in that amount made payable to:

DAVID A. ROSS, ESQ.

IOLTA TRUST ACCOUNT

RE: BRIAN & DAWN MURPHY TRUST

Judge Burrell found that the purpose of this check was to fund the trust that Mr. Ross was to establish for them. However, Mr. Ross took no further steps to establish any trust for the Murphys.

After the Murphys obtained the $85,000 bank check—and possibly at the July 29, 2008, DSS hearing—Mr. Murphy presented the check to Mr. Ross, but Mr. Ross told him that he was unable to deposit a check that referenced "BRIAN & DAWN MURPHY TRUST." On July 30, Mr. Murphy returned to SECU and obtained a new bank check in the same amount that omitted that reference. That check was forwarded to Mr. Ross, who deposited it into his attorney trust

account on August 8. Judge Burrell found that Mr. Ross failed to create and maintain a contemporaneous ledger or record for this deposit.[11]

*"Case Status Letter" dated August 6, 2008*

Mr. Ross takes exception to the finding that the $85,000 bank check was intended to be placed in a trust, arguing that the payment was, in fact, intended to compensate him for legal fees, and that he had Mr. Murphy's permission to withdraw fees from that deposit as they were earned. To support this claim, he submitted into evidence a copy of a two-page "Case Status" letter dated August 6, 2008, and addressed to Mr. Murphy. The letter purportedly acknowledges receipt of the $85,000 check "for payment on your account." Attached to this letter is an invoice, also dated August 6, that reflects total billing charges of $54,131.80 and a balance due of $40,433.20. Mr. Murphy testified that he never received this letter from Mr. Ross. Judge Burrell found that the August 6 letter and invoice, like the similar documents dated June 4, were fabricated as part of Mr. Ross' defense in the attorney grievance investigation.

*$8,000 Bank Check*

On October 15, 2008, Mr. Murphy obtained another bank check at SECU, this time in the amount of $8,000, which he gave to Mr. Ross. Judge Burrell found that this check was intended as an additional deposit into the "personal trust" that the Murphys believed Mr. Ross had established for the their benefit.[12]

---

11. Mr. Ross testified that, after he became aware that the original client ledger for Mr. Murphy was missing, he "recreated" a ledger that was substantially similar to the original. Judge Burrell found that even the "recreated" ledger failed to provide an accurate or understandable accounting of Mr. Murphy's funds. For example, the "recreated" ledger indicates that, after Mr. Ross made the $85,000 deposit on August 8, he "Billed Murphy" $44,566.80 on August 10. However, there is no corresponding disbursement in any bank statement or trust account record provided by Mr. Ross, either on August 10 or at any time thereafter.

12. Mr. Ross takes exception to this finding. He alleges that the Murphys canceled their plans for a trust after August 30, when Mrs.

*"Case Status Letter" dated November 2, 2008*

 Mr. Ross submitted into evidence a third "Case Status" letter and invoice—addressed to Mr. Murphy and dated November 2, 2008—that made no reference to the $8,000 bank check. Mr. Ross could not recall how this "Case Status" letter and invoice were sent to Mr. Murphy; Mr. Murphy testified that he never received them from Mr. Ross. Judge Burrell concluded that these documents, like the two other "case status letters" described above, were not in fact sent by Mr. Ross to Mr. Murphy.[13]

Mr. Ross excepts to this finding. He relies on the testimony of Lucretia Strippoli, a friend who assisted him with administrative work and was the purported author of the November 2 letter. Ms. Strippoli testified that Mr. Ross dictated the letter to her over the telephone and that she obtained the invoice amounts from time sheets that had been stored on a USB flash drive.[14] She stated that she then

Murphy's father decided that he did not wish to participate. Mr. Ross questions why, if the Murphys believed that their payments were being placed into a trust, they never requested documentation for tax purposes. It was not clear error for Judge Burrell to credit the Murphys' testimony that their intention was to fund a trust under the guidance of Mr. Ross.

Mr. Ross also contends that Mrs. Murphy was not his client and he owed no duty to her. He alleges that Mr. Murphy intended to file for divorce, thereby precluding Mr. Ross from representing Mrs. Murphy in any matter. Mr. Murphy denied that he expressed an intention to divorce his wife. Moreover, Mr. Ross' position is contradicted by his own testimony that he met with Mrs. Murphy and her father to discuss the family trust. The record further reveals numerous instances in which Mrs. Murphy participated in meetings with Mr. Ross and had an active role in legal decisions. Mr. Ross' exception as to his duty to Mrs. Murphy is without merit.

**13.** In her findings of fact, Judge Burrell did not specifically state that the November 2 "case status letter" was fabricated, although she did find that Mr. Murphy did not receive any invoice or "case status letter" before March 31, 2010. She also referred to a "fabricated document trail of 'Case Status' reports and invoices that were never sent or delivered to Mr. Murphy."

**14.** Neither Mr. Ross nor Ms. Strippoli produced any time sheets allegedly saved on a flash drive. In his exceptions, Mr. Ross asserts that he

signed the letter—even though, Mr. Ross testified, it was intended only to be a draft—and left the documents in his office for review. She did not testify that these documents were ever actually sent to Mr. Murphy.

Mr. Ross also asserts that he met with the Murphys to review the bill and that they expressly approved the charges. According to Mr. Ross, this meeting was held on November 3 at the apartment of his girlfriend, Jill Pumphrey, who testified that she was present and overheard a discussion between the Murphys and Mr. Ross about the bill. Judge Burrell apparently did not credit this testimony. A review of the letter and invoice—which, as discussed below, contained numerous inaccuracies—as well as the testimony by Mr. Ross, Ms. Strippoli, Ms. Pumphrey, and the Murphys, does not reveal clear error in Judge Burrell's determination that the documents had been fabricated. Mr. Ross' exception is overruled.

*Deposit of $8,000 Bank Check and Corresponding Withdrawal*

Although the supposed November 2, 2008, invoice makes no mention of the $8,000 bank check Mr. Ross had received from Mr. Murphy, his attorney trust account records show that he deposited that check into the account on November 3, 2008. On that same day, Mr. Ross cashed a check in the amount of $8,000, drawn on that same account and made payable to himself.[15] That check did not have a memo notation specifying any client matter or other purpose.

---

destroyed backup flash drives and compact discs to prevent client information from being transferrable in an electronic format. This seems to defeat the purpose of creating backup electronic files. Further, it is difficult to understand why Mr. Ross would have destroyed his backups while Mr. Murphy's representation was ongoing or during the resulting disciplinary investigation, when the documents would be important evidence in his defense.

15. Mr. Ross claims that the funds withdrawn that day corresponded to fees earned in another client's case. He asserts that, in his "recreated" client ledger, a set of initials listed after the withdrawal identifies it as related to a separate case. This "recreated" ledger, however, only creates more confusion about these transactions. The document notes

This was not the only questionable withdrawal from Mr. Ross' attorney trust account. The account records show that, beginning in June 2008 and continuing through February 2010, Mr. Ross authorized payments from the account to various personal creditors, including American Express, Chase Home Finance, and Wells Fargo Bank. Judge Burrell found that these payments were not related to any client matter but were payments of Mr. Ross' personal bills directly from the trust account.[16]

*Late 2008–2009: DSS Appeal and Home Contract Dispute*

Through the end of 2008 and into 2009, Mr. Ross had intermittent correspondence with the Murphys regarding the Murphys' contract dispute with RAH. Meanwhile, the DSS appealed the administrative decision concerning Mr. Murphy to the circuit court, where a hearing was scheduled for April 30, 2009. Mr. Ross represented Mr. Murphy in that hearing, and the administrative decision in Mr. Murphy's favor was upheld.

*March 2010 Invoice*

Mr. Ross testified that he wrote to Mr. Murphy on March 25, 2010, to inform him of outstanding legal fees. According to Mr. Ross, Mr. Murphy responded by requesting a detailed bill accounting for the hours worked. On March 31, 2010, Sandy Sivits, who assisted Mr. Ross' with billing, e-mailed Mr. Murphy an invoice on Mr. Ross' letterhead.

■ Judge Burrell found that, although the Agreement provided that "[s]tatements will be sent monthly," this was the first invoice Mr. Murphy had received during the course of the representation. The invoice billed Mr. Murphy $233,500 for

---

a November 3 withdrawal of $48,433.20 referenced as "Murphy billed," but the trust account statements provided by Mr. Ross do not indicate any such withdrawal in that amount, either on November 3 or at any time thereafter.

**16.** Between May and November 2009, Mr. Ross also deposited in the trust account three checks—totaling nearly $74,000—representing funds owed to him personally and unrelated to any client matter.

934 hours of work, including 185 hours attributed to Joyce N. Jacobson, a solo practitioner who assisted Mr. Ross with legal work on an informal basis. There was no provision in the Agreement for the services of Ms. Jacobson or any other attorney, and Judge Burrell found that Mr. Murphy was unaware that Ms. Jacobson had participated in his case.[17] Ms. Jacobson was never paid by Mr. Ross for any of the services attributed to her on the invoice.

Notable charges on the invoice included 192 hours spent on "Office of Administrative Hearings *DSS v. Murphy*" ($48,-000); 123 hours spent on "Modification of Sentence" ($30,750); seven hours spent on "Modification of Sentencing Hearing continuance" ($1,750); 42 hours spent on "DSS Review of Record Transcript" ($10,500); 125 hours spent on "DSS–Respondent's Answer" ($31,250); and 153 hours spent on "Trial Prep" ($38,250).

The invoice also reflected four payments that were inaccurately credited, even under Mr. Ross' version of events: a $5,000 payment credited on March 15, 2008; a $7,000 payment credited on May 15, 2008; a $80,000 payment credited on October 15, 2008; and a $7,000 payment credited on October 30, 2008.

The balance due was shown as $134,710.70. After further communication with Mr. Murphy, Ms. Sivits sent a revised invoice reducing the amount due to $94,710.70.[18] The revised invoice did not correct the inaccurately recorded payments.

---

17. Mr. Ross excepts to this finding. He testified that Mr. Murphy was aware of and explicitly authorized Ms. Jacobson's work, having conversed with her about the case and worked with her on the drafting of court pleadings. Ms. Jacobson testified only that Mr. Ross had introduced her to Mr. Murphy as an attorney that would be assisting in the case. Regardless of whether Mr. Murphy was aware that Mr. Ross and Ms. Jacobson had some sort of informal working relationship, the Agreement did not authorize her assistance in the case, and it was not clearly erroneous for Judge Burrell to determine that Mr. Murphy was not informed that Mr. Ross apparently planned for her to work extensively on the case.

18. Mr. Ross argued that he did not authorize Ms. Sivits to send either the original or revised invoice. It is not evident why Ms. Sivits would

The March 31, 2010, invoice is marked by numerous examples of imprecise charges for vaguely described services, including cumulative representations of time allegedly spent by Mr. Ross and Ms. Jacobson on various matters. These large time blocks were inconsistent with the original Agreement's provision that time for charged services would be "kept in increments of one-tenth (1/10) of an hour." Although Mr. Ross testified that he worked all of the hours he billed, he did not produce incremental time records that supported any of the invoice's charges.

The March 31, 2010, invoice also contradicted some of Mr. Ross' testimony at the hearing. For example, Mr. Ross testified that he never drafted a trust to hold money for the Murphys' future children. However, the invoice provides a charge of $1,500 for six hours on September 6, 2008, spent drafting a "Trust for any refund of retainer fee to be deposited to for the benefit of Dawn Murphy and per stirpes children."

In a detailed analysis based on these facts, Judge Burrell concluded that there was clear and convincing evidence that Mr. Ross violated MLRPC 1.4 (communication), 1.5 (fees), 1.15 (safekeeping property), and 8.4 (misconduct); Maryland Rules 16–604, (trust accounts—required deposits), 16–606 (name and designation of trust account), 16–606.1 (trust account record

---

have sent Mr. Murphy bills unless Mr. Ross asked her to do so. Moreover, Ms. Sivits' e-mail transmitting the revised invoice begins, "After speaking with Mr. Ross your bill has been revised," indicating that Mr. Ross was at least aware she had sent Mr. Murphy the first invoice.

In his exceptions, Mr. Ross describes the invoice as merely an "estimate" and not a final bill. The first e-mail from Ms. Sivits contains the subject line "Billing from Mr. Ross" and the attached document is twice labeled an "invoice" and ends with an "AMOUNT DUE UPON RECEIPT." The second e-mail had the subject line "revised bill from David Ross," referred to "your bill," and contained an attachment titled "Murphy billing_sheet." That document is, again, twice labeled an "invoice" and ends with the "AMOUNT DUE UPON RECEIPT." It was not clearly erroneous for Judge Burrell to conclude that the documents were what they said they were.

keeping), and 16–609 (prohibited transactions); and BOP § 10–306 (misuse of trust money).

## Discussion

We review the hearing judge's conclusions of law *de novo* pursuant to Maryland Rule 16–759(b)(1), in light of the exceptions filed by Mr. Ross.[19] For the reasons set forth below, we agree with the conclusions of the hearing judge.

*MLRPC 1.4*

MLRPC 1.4(a)(2) requires a lawyer to "keep the client reasonably informed about the status of the matter." MLRPC 1.4(b) requires a lawyer to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

The record is replete with failures of communication. For example, Mr. Ross did not provide Mr. Murphy with monthly billing statements as required by the Agreement, nor did Mr. Ross otherwise inform the Murphys of the actions he was taking on their behalf and how much those efforts would cost. The Murphys believed that Mr. Ross was establishing a trust on their behalf; Mr. Ross failed to establish this trust and did not communicate his progress on the matter. The Murphys believed they had placed $93,000 in that trust; Mr. Ross did not tell them that he had taken that money for legal fees. The Murphys were also not made aware of the considerable number of hours Mr. Ross was billing for Ms. Jacobson's work on the case—work that was not contemplated in the Agreement. These lapses in communication violated MLRPC 1.4(a)(2) and (b).

---

**19.** Many of Mr. Ross' lengthy exceptions to Judge Burrell's conclusions of law reveal confusion about the facts she found and relied upon in reaching those conclusions, as well as misunderstandings about the pertinent rules. In this opinion, we address only whether there is clear and convincing evidence of the violations charged and do not attempt to correct every mistaken premise or assertion that appears in the exceptions.

## MLRPC 1.5

MLRPC 1.5(a) forbids an attorney from making an agreement for, charging, or collecting "an unreasonable fee or an unreasonable amount for expenses," and lists eight factors to be considered in the analysis. MLRPC 1.5(b) provides that "[t]he scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation[.] ... Any changes in the basis or rate of the fee or expenses shall also be communicated to the client."

Paul Kemp, a local attorney with extensive experience representing criminal defendants, testified at the hearing as an expert witness called by Bar Counsel as to the customary and acceptable standards in the legal community for the keeping of time records, hourly billing, and reasonable fees. Mr. Kemp opined that Mr. Ross billed an unreasonable number of hours related to the DSS proceeding and appeal. Specifically, Mr. Kemp questioned Mr. Ross' charges for 182 hours in preparation for the administrative hearing, 42 hours for later review of the transcript and record of that hearing, 125 hours to file an appellate brief, and 163 hours to prepare for the appellate hearing. Mr. Kemp also believed the billing of 123 hours for a request for sentence modification was excessive. Judge Burrell found this testimony persuasive, and concluded that these fees charged by Mr. Ross were unreasonable and in violation of MLRPC 1.5(a).

Mr. Ross takes exception to this conclusion. He argues that he did all of the work for which he billed and that the positive results he obtained for his client were the result of extensive preparation and thorough briefing. He contends that Mr. Kemp did not have sufficient knowledge of the community billing standards and that his opinions were arbitrary. He also complains that Judge Burrell's analysis did not explicitly address the eight factors of MLRPC 1.5(a).

This last objection has some merit. Judge Burrell did not explicitly address the factors set out in the rule, but consider-

ation of them leads to the same conclusion she reached. Six of the factors set out in MLRPC 1.5(a) are relevant here:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained; . . .

(6) the nature and length of the professional relationship with the client; [and]

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services[.]

MLRPC 1.5(a).

As to factor (1), Mr. Ross argues that Mr. Murphy's legal matters were time-consuming and required extraordinary effort. He contends that the legal questions presented in the case were novel and complex, necessitating a great deal of research and preparation. As to factor (2), he asserts that his representation of Mr. Murphy foreclosed potential work for other clients. He did not, however, produce evidence of any particular matter that he was precluded from undertaking. As to factor (4), Mr. Ross highlights the favorable outcomes he achieved for Mr. Murphy. As to factor (6), he notes that Mr. Murphy was his client for two years, and, as to factor (7), he asserts that he had "substantial knowledge in the area of this litigation" with "educational experience and work experience" in both child abuse cases and financial matters.

Factor (4) unquestionably weighs in Mr. Ross' favor: His efforts obtained favorable outcomes for his client in certain respects. However, factors (1), (3), and (7) do not lead to the conclusion that his fees were reasonable. Mr. Kemp testified that, although some of Mr. Murphy's issues may have been atypical, any "novelty and difficulty of the questions involved"

did not rise to such a level as to require the excessive hours for which Mr. Ross billed. This is especially true given Mr. Ross' contention that he had "substantial knowledge" of the subject matter and experience with these types of cases. Thus, factors (1) and (7) weigh against Mr. Ross.

As an expert on the local billing standards, Mr. Kemp made clear that Mr. Ross' charges did not accord with fees "customarily charged in the locality for similar legal services." Although Mr. Ross now claims that Mr. Kemp did not have adequate knowledge of community billing standards, he did not argue at the hearing that Mr. Kemp was unqualified to testify about those standards.[20] Mr. Ross presented no evidence that Mr. Kemp's opinions were untrustworthy. Factor (3) therefore supports a finding that those fees were unreasonable.

A review of Mr. Ross' invoices reveal numerous questionable expenditures of time. In applying the analysis contemplated by MLRPC 1.5(a), the results obtained by Mr. Ross are outweighed by consideration of the time required to do the work and the fees customarily charged in the community for that work. We agree with Judge Burrell's conclusion that the fees set forth in his invoices, even had those invoices been created contemporaneously, were excessive and unreasonable.

■■■ Judge Burrell found that Mr. Ross violated MLRPC 1.5(b) by failing to adequately communicate the basis for his fees. The Agreement between Mr. Ross and Mr. Murphy explained Mr. Ross' fees only in regards to the criminal appeal. In the other matters—which quickly became the focus of Mr. Ross' representation—Judge Burrell found that the Murphys were not provided an adequate accounting of the hours Mr. Ross claimed to have worked. The Murphys were not informed of the basis for the fees that Mr. Ross charged.

---

**20.** At the hearing, Mr. Ross objected to the testimony of Mr. Kemp as an expert witness, but not on the basis of a lack of expertise. Rather, Mr. Ross argued that the determination of whether his fees were reasonable should be made by the hearing judge without the benefit of expert testimony.

We agree with Judge Burrell that this was a violation of MLRPC 1.5(b).

*MLRPC 1.15*

 MLRPC 1.15(c) provides that "[u]nless the client gives informed consent, confirmed in writing, to a different arrangement, a lawyer shall deposit legal fees and expenses that have been paid in advance into a client trust account and may withdraw those funds for the lawyer's own benefit only as fees are earned or expenses incurred." Judge Burrell found that the initial $5,000 retainer payment paid by the Murphys was "legal fees and expenses that have been paid in advance" and had not been earned by Mr. Ross at the time he received it. Mr. Ross did not place that payment into a client trust account as required by MLRPC 1.15(c), and therefore violated the Rule.

 MLRPC 1.15(a) requires that a lawyer:

hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that chapter. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the lawyer and shall be preserved for a period of at least five years after the date the record was created.

Because Mr. Ross had not yet earned the first $5,000 he received from Mr. Murphy, it remained the property of his clients, and he was required by MLRPC 1.15(a) to hold the funds separate from his own property in an account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Mr. Ross instead placed the money directly into his personal bank account.

In addition, Mr. Ross later deposited at least three personal checks, totaling nearly $74,000, into his client trust account. He therefore did not hold client funds separate from his own property, also violating MLRPC 1.15(a) in that regard.

Finally, although Mr. Ross placed the $85,000 and $8,000 checks from the Murphys in his client trust account, he did not create records for the deposits or the subsequent withdrawals from those sums, in further violation of MLRPC 1.15(a)'s directive to create and maintain account records pursuant to Title 16, Chapter 600 of the Maryland Rules.

 MLRPC 1.15(d) states that "a lawyer shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render promptly a full accounting regarding such property." Judge Burrell found that the Murphys periodically questioned Mr. Ross about the status of their deposits, which the Murphys believed were being used to establish a trust. Mr. Ross failed to give the Murphys any accounting of these deposits until the March 31, 2010, invoice, after he had taken all the money for his claimed legal fees. Mr. Ross therefore did not, upon request by the Murphys, promptly render a full accounting of their property, a violation of MLRPC 1.15(d).

*MLRPC 8.4*

MLRPC 8.4(a) states that it is professional misconduct to violate or attempt to violate any of the rules of professional conduct; accordingly, its violation follows from the other violations of the MLRPC. MLRPC 8.4(c) and (d) prohibit a lawyer from engaging in, respectively, "conduct involving dishonesty, fraud, deceit or misrepresentation" and "conduct that is prejudicial to the administration of justice."

 Mr. Ross took, without permission, client funds that were intended for a trust. He then created fraudulent and inflated billing statements and records—not delivered to his clients—to justify those fees and disguise his mismanagement of client funds. These actions and misrepresentations were

dishonest, fraudulent, deceitful, and prejudicial to the administration of justice. Mr. Ross therefore violated MLRPC 8.4(c) and (d). *See Attorney Grievance Comm'n v. Braskey,* 378 Md. 425, 451–452, 836 A.2d 605, 621 (2003) (collection of unreasonable fees violates both MLRPC 8.4(c) and (d)); *Attorney Grievance Comm'n v. Cherry–Mahoi,* 388 Md. 124, 156, 879 A.2d 58, 80 (2005) (misappropriation of client funds violates both MLRPC 8.4(c) and (d)); *Attorney Grievance Comm'n v. Nothstein,* 300 Md. 667, 480 A.2d 807 (1984) (fraudulent billing is conduct involving dishonesty, fraud, deceit, or misrepresentation and prejudicial to the administration of justice).

### *Maryland Rule 16–604*

Maryland Rule 16–604 states that "all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution."

Judge Burrell found that Mr. Murphy's payment of $5,000 to Mr. Ross on May 8, 2008, was not intended to pay for past services by Mr. Ross. Mr. Ross was therefore required to place this payment in an attorney trust account. He did not do so, and thus violated Maryland Rule 16–604.

### *Maryland Rule 16–606*

Maryland Rule 16–606 states that "[a]n attorney or law firm shall maintain each attorney trust account with a title that includes the attorney or law firm and that clearly designates the account as 'Attorney Trust Account,' 'Attorney Escrow Account,' or 'Clients Funds' Account' on all checks and deposit slips."

Mr. Ross' trust account was titled "DAVID A. ROSS, ESQ. IOLTA CLIENT TRT FUND." This title violated the rule. "Rule 16–606 is quite clear; it requires that all attorney

trust accounts be designated in one of three manners." *Attorney Grievance Comm'n v. Ellison,* 384 Md. 688, 708, 867 A.2d 259, 271 (2005).[21] Mr. Ross' trust account was not designated in one of the three ways permitted by Rule 16–606. *See id.* ("IOLTA" not a permissible account name under Rule 16–606). Mr. Ross therefore violated Maryland Rule 16–606.

### *Maryland Rule 16–606.1*

Maryland Rule 16–606.1(a) states that "[t]he following records shall be created and maintained for the receipt and disbursement of funds of clients or of third persons: ... (2) Deposits and disbursements. A record for each account that chronologically shows all deposits and disbursements[.] ... (3) A record for each client matter in which the attorney receives funds in trust[.]"

Judge Burrell determined that Mr. Ross did not create records that accurately and chronologically accounted for deposits of and disbursements from client funds, nor records for each client matter for which funds were received in trust. Judge Burrell found that even Mr. Ross' "recreated" records did not sufficiently account for deposits to, and disbursements from, the Murphys' funds held in trust. We agree that Mr. Ross did not comply with the specific requirements for attorney trust account maintenance as set forth in Maryland Rule 16–606.1(a).

---

21. In his exceptions, Mr. Ross argues that *Ellison* was wrongly decided. He asserts that the three names provided for in Rule 16–606 are mere examples, and other names that are substantially similar are equally valid. He asserts that the word "as" in the phrase "clearly designates the account *as* 'Attorney Trust Account,' 'Attorney Escrow Account,' or 'Clients Funds' Account' " means "like, similar to, of the same kind, in the same manner." For this proposed definition, he cites the 1983 version of Black's Law Dictionary. Citing the 1983 version of Merriam–Webster's New Collegiate Dictionary, he also defines "as" to mean "[t]o the same degree or amount" or "[f]or instance." However, as *Ellison* made clear, the word "as" is used in the rule in a conjunctive sense, meaning "in the form or condition in which." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 125 (2002). The Rule therefore describes the form in which an account may be designated: either "Attorney Trust Account," "Attorney Escrow Account," or "Clients Funds' Account." Mr. Ross' exception is overruled.

*Maryland Rule 16–609*

MLRPC 16–609(a) states, "An attorney or law firm may not borrow or pledge any funds required by the Rules in this Chapter to be deposited in an attorney trust account ... or use any funds for any unauthorized purpose."

Mr. Ross received $93,000 to be placed into a personal trust for his clients' benefit. He then took the funds for his legal fees without obtaining his clients' permission to do so. This was an unauthorized use of funds from his attorney trust account, in violation of MLRPC 16–609(a).

*BOP § 10–306*

BOP § 10–306 states, "A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer."

As previously noted, Mr. Ross took $93,000 of trust money for his legal fees, which was not the purpose for which those funds were entrusted to him. He therefore violated BOP § 10–306.

*General Objections*

Several of Mr. Ross' "exceptions" do not relate to any of Judge Burrell's findings of fact or conclusions of law. Rather, they are directed to the nature or conduct of the proceedings against him. Mr. Ross contends: (1) that the Bar Counsel's prosecution of disciplinary charges concerning his fees violates antitrust law; (2) that he was discriminated against for having a disability; (3) that he was unlawfully denied the opportunity to put on exculpatory testimony; (4) that the Commission committed a fraud upon the court; (5) that the hearing judge should have recused herself because of a conflict of interest; and (6) that he was inappropriately found to be responsible for uncharged violations.[22] These contentions are frivolous and we address them only briefly.

---

22. In this last exception, Mr. Ross failed to identify any such uncharged violations. The exception is therefore overruled.

First, Mr. Ross cites *Goldfarb v. Va. State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), for the proposition that a bar association's establishment of fee schedules may constitute price-fixing. He argues that, by requiring that attorney fees to be reasonable, the Commission has engaged in a prohibited price-fixing scheme. There is no indication of price-fixing in the record. Moreover, Mr. Ross neglects to note that Bar Counsel, as a state official enforcing this Court's disciplinary rules and subject to its supervision, has "state action" immunity from the antitrust laws. *See Bates v. State Bar of Arizona,* 433 U.S. 350, 359–63, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). In connection with this exception, Mr. Ross also argues that the regulation of his billing practices violates the "freedom of contract" between client and attorney.[23] While "freedom of contract" may be a general policy animating contract law, that policy is subject to modification by other law; in the regulation of the legal profession, the disciplinary rules prohibit an attorney from charging unreasonable fees.

Second, Mr. Ross accuses the Commission of launching disciplinary proceedings against him solely because of a disability he suffers as a result of a motor vehicle accident.[24] Pointing to the hearing judge's finding that this accident occurred in the midst of his representation of the Murphys, he asserts that this finding is unrelated to the Commission's charges and therefore evidence of disability discrimination on the part of the judge. This allegation is unfounded. There is no evidence that the Commission's investigation was motivated by Mr. Ross' disability, or that the hearing judge harbored

---

**23.** Ross further states that, by penalizing him for charging unreasonable fees, the Commission generally impinges upon Sixth Amendment rights under the United States Constitution. The Sixth Amendment provides that "in all criminal prosecutions, the accused shall ... have the Assistance of Counsel for his defence." Mr. Ross does not adequately explain how—or cite any legal authority suggesting that—by disciplining him for overcharging a client, the Commission prevents criminal defendants from receiving the assistance of counsel.

**24.** Mr. Ross suffers seizures and travels with a medical service dog that alerts him to impending seizures.

any discriminatory animus. Moreover, Mr. Ross included the occurrence of the accident among the proposed findings he submitted to the hearing judge. Mr. Ross may not propose that a fact be included in the findings and later accuse the hearing judge of discrimination for doing so.

 Third, Mr. Ross claims that he was denied the ability to introduce exculpatory testimony when the hearing judge asked one of his witnesses to "kind of speed it up." A review of the transcript shows that this witness testified virtually uninterrupted for 10 pages of the transcript prior to the judge's request and for another six pages of the transcript after the request. The record shows that Judge Burrell gave the witness more than adequate time to testify.

 Fourth, Mr. Ross accuses the Commission of committing fraud in its investigation and the conduct of the disciplinary proceedings against him.[25] He faults the Commission for failing to investigate probation violations by Mr. Murphy, and hypothesizes that the Commission has attempted to provide Mr. Murphy with immunity from future criminal prosecution so as to shield the State from *respondeat superior* liability in any civil litigation that might arise from Mr. Murphy's conduct. These implausible and unsubstantiated allegations reveal a lack of understanding about the Commission's authority and purpose. The Commission is not responsible for prosecuting alleged violations of probation and does not have the power to grant immunity from criminal prosecution. Nor does it have any stake in whether third parties attempt to file

---

**25.** Mr. Ross filed a motion with this Court to dismiss the proceeding against him on the ground that Bar Counsel had violated MLRPC 3.3 ("A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer; ... (4) offer evidence that the lawyer knows to be false. If the lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures."). In that pleading, Mr. Ross asserts that Bar Counsel deliberately suborned perjury by the Murphys, intentionally covered up Mr. Murphy's criminal behavior, and attempted to shield Mr. Murphy from liability for his crimes. For the same reasons discussed in the text with respect to his exception, we deny the motion.

civil lawsuits against other state agencies. The Commission initiates, investigates, and prosecutes disciplinary violations by attorneys that relate to the practice of law.

Mr. Ross also argues that the Commission committed fraud by not fully investigating his claim that his records were stolen by Mr. Murphy.[26] As discussed above, in assessing Mr. Ross' explanations of his record-keeping practices, his account of the records' alleged disappearance, and the "recreated" records entered into evidence, Judge Burrell was entitled to find that accurate and complete records had never been created in the first place. In its investigation, the Commission was similarly entitled to conclude that the records never existed; the Commission did not have an obligation to pursue every improbable theory advanced by Mr. Ross about his inability to produce the records he was required to maintain. In any event, Mr. Ross was given the opportunity at his hearing to present his own evidence on this contention, which the hearing judge found not to be credible. There is no indication that the Commission's investigation was in any way deficient so as to constitute fraud.

Fifth, Mr. Ross contends that Judge Burrell should have recused herself from his case because, more than 10 years ago prior to joining the bench, she served as a member of the Inquiry Committee of the Attorney Grievance Commission.[27] He asserts that this is a violation of Rule 2.11 of the Maryland Code of Judicial Conduct, codified at Maryland Rule 16–813, which states, "[A] judge is disqualified whenever the judge's impartiality might be reasonably questioned[.]" He argues that Judge Burrell's service on the Inquiry Committee

---

**26.** Mr. Ross further alleges that the Commission investigator assigned to his case was a former law enforcement colleague of either Mr. Murphy or Mr. Murphy's father, and therefore was biased. This appears to be speculation as he offered no facts in the record to substantiate this claim.

**27.** Prior to 2001, the Inquiry Committee was part of the process by which the Commission investigated alleged misconduct. *See* Maryland Rules 16–705, 16–706 (2001). That process was later modified and the Inquiry Committee was replaced by the Peer Review Committee.

created a conflict of interest that required her recusal or, at the very least, her informing the parties of the conflict so that he had the option of requesting recusal.

 "[T]he issue of recusal in attorney discipline matters is within the province of the Court of Appeals." *Attorney Grievance Comm'n v. Shaw*, 363 Md. 1, 10–11, 766 A.2d 1028 (2001) (citing *Attorney Grievance Comm'n v. Hollis*, 347 Md. 547, 559, 702 A.2d 223 (1997)). Maryland Rule 16–752(c) provided Mr. Ross with the opportunity to request a different hearing judge in his case. That rule provides that, within 15 days of being served with the petition for disciplinary or remedial action, a party may request that another judge be designated. "[T]he party requesting recusal has a heavy burden to overcome the presumption of impartiality and must prove that the judge has a personal bias or prejudice against him or her or has personal knowledge of disputed evidentiary facts." *Id.* Mr. Ross did not request assignment of a new judge at the appropriate time or produce any evidence justifying recusal. Moreover, there is no evidence that Judge Burrell was personally biased or prejudiced against him, or that her one-time service with the Inquiry Committee more than a decade ago gives her any personal knowledge about disputed facts in his case. The exception is overruled.

### Sanction

 Conduct involving fraud, dishonesty, or deceit will ordinarily result in disbarment absent compelling extenuating circumstances. *Attorney Grievance Comm'n v. Keiner*, 421 Md. 492, 523, 27 A.3d 153 (2011) (citing *Attorney Grievance Comm'n v. Palmer*, 417 Md. 185, 207, 9 A.3d 37 (2010)). "Misappropriation of funds by an attorney is an act infected with deceit and dishonesty and ordinarily will result in disbarment[.] . . . The sanction of disbarment is so justified because attorneys are charged with remembering that the entrustment to them of the money and property of others involves a responsibility of the highest order. They must carefully administer and account for those funds. Appropriating any part of those funds to their use and benefit without clear authority

to do so cannot be tolerated." *Attorney Grievance Comm'n v. Elliott,* 417 Md. 659, 676, 12 A.3d 105 (2011) (quoting *Attorney Grievance Comm'n v. Roberts,* 394 Md. 137, 166, 904 A.2d 557 (2006)). Furthermore, the submission to the Attorney Grievance Commission of fabricated evidence in a "carefully contrived" effort to conceal prior misconduct also warrants disbarment. *Attorney Grievance Comm'n v. Smith,* 425 Md. 230, 236, 40 A.3d 34 (2012).

Judge Burrell found that Mr. Ross misappropriated client trust money and fabricated a document trail to hide his actions. Mr. Ross offers no mitigating circumstances to explain these ethical failures. Rather, he denies all the violations charged and argues that he should not be subject to any sanction.

As explained at length above, Judge Burrell's findings are not clearly erroneous and her conclusions are sound. Disbarment is the appropriate sanction.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST DAVID A. ROSS.**